Rom Bar-Nissim (SBN 293356)
Rom@HeahBarNissim.com
HEAH BAR-NISSIM LLP
1801 Century Park East, Suite 2400
Los Angeles, CA 90067
Telephone: (310) 432-2836

*Attorney for Plaintiffs and the Proposed Class*
[additional counsel on signature page]

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| TED ENTERTAINMENT, INC., MATT FISHER, GOLFHOLICS, INC., AND NICOLE CHMURA each individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> SNAP, INC., <br> Defendant | Case No.: 2:26-CV-00754-AB-MBK <br><br> **CONSOLIDATED CLASS ACTION COMPLAINT** <br><br> **DEMAND FOR JURY TRIAL** |

CONSOLIDATED CLASS ACTION COMPLAINT

Plaintiffs Ted Entertainment, Inc. ("TEI"), Matt Fisher, Golfholics, Inc., and Nicole Chmura (collectively, where appropriate "Plaintiffs"), each individually and on behalf of all others similarly situated (the "Class," as defined below), by and through their undersigned counsel, file this Complaint against Snap, Inc. ("Defendant"), for violations of the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 1201. The allegations are based on Plaintiffs' knowledge of facts pertaining to themselves and their own actions and counsels' investigations, and upon information and belief as to all other matters.

## **NATURE OF THE ACTION**

1.      This is a nationwide class action for violations of the DMCA's anti-circumvention provisions, 17 U.S.C. § 1201(a), arising from Defendant unlawfully circumventing technological protection measures to access and scrape millions of copyrighted videos from the online video viewing platform, YouTube, in order to feed, train, improve, and commercialize Defendant's large-scale generative text-to-video artificial intelligence ("AI") models named , HPDM, VD3D, SF-V, SnapGen-V, and AC3D (collectively "Snap AI Video").

2.      YouTube allows the public to view audiovisual works only through controlled streaming, keeping its underlying video files locked away behind access restrictions. YouTube does not provide public access to the underlying audiovisual works themselves, but instead delivers those works through a controlled streaming architecture that includes technological protection measures ("TPMs") which require the application of authorized processes, including tokenized requests, segmented delivery protocols, and player-based reconstruction.

3.      Defendant intentionally bypassed those restrictions by deploying tools designed to evade YouTube's TPMs. Defendant deployed automated systems that replicated and manipulated authorized request flows while evading enforcement mechanisms, effectively picking the digital lock that prevented access to the works in a form not available to the public and outside the conditions authorized by the

copyright owners.

4.      On information and belief, Defendant used automated video-downloading programs combined with virtual machines that rotated IP addresses to avoid detection and blocking, enabling the mass unauthorized access and extraction of videos at the scale necessary to train Snap AI Video. Defendant then used Plaintiffs' and Class Members' intellectual property for their own commercial gain in developing and commercializing Snap AI Video. In doing so, Defendant has violated the law (and YouTube's Terms of Service), which were intended to protect Plaintiffs and others similarly situated.

5.      By accessing, scraping, and downloading those files, Defendant deliberately circumvented YouTube's access controls to obtain the training data necessary to build and commercialize Snap AI Video.

6.      This case does not concern ordinary viewing or downstream copying of publicly available content. It concerns Defendant's deliberate circumvention of YouTube's controlled streaming architecture to access copyrighted works in a form and manner not made available to the public. YouTube does not provide open access to audiovisual works themselves, but instead conditions access on the application of specific technical processes that Defendant intentionally bypassed.

7.      Plaintiffs and the Class Members whom Plaintiffs seek to represent are content creators who upload their audiovisual content to YouTube. On information and belief, the audiovisual content of Class Members was among the video content utilized by Defendant to train Snap AI Video and related generative AI models.

8.      In uploading content to YouTube, content creators are authorizing and instructing YouTube to provide protection to the video content through YouTube's anti-circumvention software. In fact, YouTube's anti-circumvention software is a driving factor behind many content creators' decision to upload their video content to YouTube.

9.      Rather than seek permission or pay a fair price for the audiovisual

CONSOLIDATED CLASS ACTION COMPLAINT

content hosted on YouTube, Defendant harvested content creators' protected and copyrighted videos for commercial use and at scale without consent from or compensation to the content creators.

10. Defendant's actions were not only unlawful, but an unconscionable attack on the community of content creators whose content is used to fuel the multi-trillion-dollar generative AI industry without any compensation.

11. Content creators such as Plaintiffs and the Class Members will never be able to claw back the intellectual property unlawfully copied and used by Defendant to train its generative AI models. Once AI ingests content, that content is stored in its neural network and not capable of deletion or retraction. Defendant's actions constitute abuse and exploitation of content creators' work for Defendant's profit.

12. Most YouTube videos are not registered with the U.S. Copyright Office. That lack of registration, however, does not render them valueless or leave them unprotected. Content creators invest time, skill, and resources into producing their works, and they rely on YouTube's TPMs to safeguard their files from unauthorized access. Copyright registration is not a legal prerequisite for bringing a claim alleging unlawful circumvention of access controls.

13. The availability of such claims protect a flourishing internet ecosystem. If Defendant and others could circumvent technological protections to exploit copyrighted works without authorization and with impunity, creators would be less likely to make their creations available on YouTube and other similar platforms for fear of losing all control of them. The world would be poorer for it.

14. An essential component of Defendant's business model—powering AI features and services with large-scale training data—includes the mass acquisition and ingestion of creators' videos scraped from YouTube.

15. Defendant has benefitted substantially from its infringement of Plaintiffs' and Class Members' video content through Defendant's training of its generative AI products. Defendant's massive financial success would not have been

possible without the video content created by Plaintiffs and Class Members, which was intended for streaming on YouTube.

16.    Plaintiffs bring this class action on behalf of themselves and on behalf of a nationwide class of YouTube creators whose works were scraped, ingested, and trained on without authorization, seeking statutory damages, injunctive relief, restitution, and all other remedies allowed by law pursuant to the DMCA § 1201(a) seeking an injunction and damages commensurate with the scope of Defendant's massive and ongoing infringement.

## THE PARTIES

17.    Plaintiff Ted Entertainment, Inc. ("TEI"), is an independent California-based media company and content creator with over 5,800 original videos on YouTube, with a combined total of over 4 billion views. TEI has amassed a substantial following on YouTube with over 2.6 million subscribers to its channels. TEI owns and operates the channels "h3h3 Productions" and "H3 Podcast Highlights." H3H3 Productions appears with 146 videos in HD-VILA-100M and 155 videos in Panda-70M. H3 Podcast Highlights appears with 285 videos in HD-VILA-100M and 283 videos in Panda-70M. TEI invested significant resources – time and money – into producing and publishing this video content and bringing awareness to its content.

18.    Plaintiff TEI is the creator of original video works uploaded exclusively to YouTube by TEI, through which TEI derives value via viewership, advertising, sponsorships, licensing, and related monetization.

19.    Plaintiff TEI and its owners – Ethan and Hila Klein – are longtime champions of the rights of YouTube creators. The Kleins helped define what constitutes fair use reaction videos and the good faith belief standard for DMCA counternotifications. TEI has championed online free speech and is currently helping define what reaction content does not constitute fair use to ensure YouTube content creators can enjoy the fruits of their labor.

20.     Plaintiff Matt Fisher is an individual and resident of the State of California. He is a golf content creator who posts his original videos on YouTube, many of which are instructional.  His channel is "MrShortGame Golf" on the YouTube platform.  He has over 500,000 subscribers and hundreds of millions of views.  Plaintiff Fisher has invested substantial time and money into bringing awareness around his content. MrShort Game appears with 2 videos in HD-VILA-100M and 8 videos in Panda-70M.

21.     Plaintiff Matt Fisher is the creator of original video works uploaded exclusively to YouTube by Matt Fisher, through which Matt Fisher derives value via viewership, advertising, sponsorships, licensing, and related monetization.

22.     Plaintiff Golfholics is a corporate entity organized pursuant to the laws of the State of California. It is a golf content channel that posted its original videos on YouTube. The channel is "Golfholics" on the YouTube platform. It has over 130,000 subscribers and millions of views.  Plaintiff invested substantial time and money into bringing awareness around its content. Golfholics appears with 62 videos in HD-VILA-100M and 62 videos in Panda-70M..

23.     Plaintiff Golfholics is the creator of original video works uploaded exclusively to YouTube by Golfholics, through which Golfholics derives value via viewership, advertising, sponsorships, licensing, and related monetization.

24.     Plaintiff, Nicole Chmura, is a resident of California and the owner and operator of the YouTube channel "Let's Go Team." The channel features videos documenting Plaintiff Chmura's own personal travel experiences, which she independently records and publishes. Through the channel, Plaintiff Chmura provides firsthand observations and candid opinions based on trips she personally undertakes and pays for. Plaintiff Chmura does not accept free or discounted travel, lodging, or services from cruise lines, airlines, hotels, or other travel-related entities, and the content on the channel reflects her independent, unsponsored viewpoints. Nicole Chmura appears with one video in HD-VILA-100M.

25.     Plaintiff Nicole Chmura is the creator of original video works uploaded exclusively to YouTube by Nicole Chmura.

26.     Defendant Snap Inc., is a Delaware corporation with its principal place of business at 3000 31st Street, Santa Monica, CA 90405.

## JURISDICTION AND VENUE

27.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332(d) (the Class Action Fairness Act) because the amount in controversy exceeds $5,000,000, exclusive of interest and costs, and a member of the Class is a citizen of a different state than Snapchat. This Court also has subject matter jurisdiction under 28 U.S.C. § 1331 because this action arises under 17 U.S.C. § 1201, et seq..

28.     The Court has supplemental jurisdiction over related state-law claims, if any, under 28 U.S.C. § 1367.

29.     Personal jurisdiction is proper because Defendant's principal place of business is in Santa Monica, California, purposefully avails itself of this forum, and a substantial part of the events or omissions giving rise to these claims occurred or were directed here.

30.     Venue lies in this judicial district pursuant to 28 U.S.C. § 1391(b)(1) and/or 1400(a) because Defendant resides in, is found in, or may be sued in this District, and a substantial part of the events giving rise to the claims occurred here.

31.     Plaintiffs reserve the right to refine jurisdiction and venue allegations after discovery and as additional facts become available.

## FACTUAL BACKGROUND

**A.     YouTube Employs TPMs that Function as Access Controls Over Video Files.**

32.     As noted above, Plaintiffs and the Class Members are content creators of audiovisual content. Plaintiffs and the Class Members create original video content that has been uploaded onto YouTube's video sharing platform.

33.     The audiovisual work at issue is embodied in digital form through

6
CONSOLIDATED CLASS ACTION COMPLAINT

encoded media streams and associated data structures that together constitute the work itself. The segmented streams and underlying media representations obtained by Defendant collectively comprise the copyrighted work and are not distinct from it.

34. YouTube's "users"—the individuals who view the digital content available on YouTube—can watch and listen to videos for free on YouTube's advertising-supported service, but YouTube locks users from downloading copies of the work. In short, YouTube employs TPMs to ensure that users can view videos uploaded to YouTube only through the authorized playback mechanism.

35. To enforce its prohibitions on downloading content, YouTube uses technological processes and tools to detect and block access to files for unauthorized downloading. For example, YouTube monitors downloading activity and blocks IP addresses that make too many download attempts in a specified period.

36. While YouTube permits members of the public to view audiovisual works through its platform, such permission is limited to access through YouTube's authorized playback environment and subject to the technological conditions imposed by its delivery systems.

37. For example, YouTube does not authorize access to audiovisual works through automated extraction, direct retrieval of media streams, or reconstruction of works outside its controlled environment.

38. YouTube does not provide users with direct access to audiovisual works in their native or fixed form. YouTube only delivers audiovisual works through a controlled streaming architecture that transmits segmented, time-limited portions of a work for ephemeral playback within YouTube's proprietary player environment.

39. To protect against file-level access, YouTube deploys multiple TPMs designed to control, restrict, and monitor access to the underlying video files and to deter extraction outside YouTube's controlled playback environment.

40. YouTube's TPMs effectively control access to audiovisual works by

7
CONSOLIDATED CLASS ACTION COMPLAINT

requiring the application of information and processes with YouTube's authorization before a user may obtain the work in usable form.

41.    These TPMs control how videos are delivered and accessed. For example, YouTube uses temporary, expiring links to send pieces of a video; breaks videos into small segments that must be put together in a specific way; checks and controls each request to make sure it follows the proper sequence; and requires the video to be assembled and played through YouTube's own player rather than accessed directly.

42.    In simple terms, YouTube does not deliver a copy of a video file to every user seeking to view content. Instead, it sends the video in pieces, through temporary links, and only lets those pieces be put together and played using its own system, while checking each step along the way. This limits a user to streaming through YouTube's authorized streaming mechanism and locks a user out of the ability to download the audiovisual file.

43.    These measures function as access controls because they condition access to the audiovisual work on the application of authorized processes and prevent users from obtaining the work outside YouTube's controlled delivery system.

44.    Viewing a work on YouTube therefore requires the application of a sequence of authorized processes, including the issuance and validation of session-specific tokens, execution of player-side instructions, and reconstruction of segmented media streams into a continuous audiovisual experience. The audiovisual work itself—i.e., the complete, machine-readable embodiment of the work capable of being copied, processed, or analyzed—cannot be accessed by the public absent a means of bypassing or circumventing these specific controls.

45.    The TPMs specifically alleged here include, among others: (1) an obfuscated signature system commonly referred to as a "rolling cipher," (2) IP-based blocking and rate limiting that restrict high-volume automated access, (3) short-lived, session-bound streaming URLs, (4) CAPTCHA human-verification challenges

triggered by automated activity, and (5) proof-of-origin tokens that verify requests originating from authorized client environments.

46.     Each TPM is an access control which independently functions as a gatekeeping mechanism that must be circumvented before the audiovisual file can be retrieved, and circumvention of any one of them enables access to the file in a manner not authorized by YouTube or the owners of the content.

47.     Defendant accessed and obtained the audiovisual works themselves—not merely "files" distinct from those works—by reconstructing and assembling the protected media streams outside YouTube's authorized environment.

48.     Defendant exceeded any authorized access by obtaining audiovisual works through methods that bypassed the technological conditions placed on the video streams. Defendant's conduct therefore constituted access "without the authority of the copyright owner" within the meaning of 17 U.S.C. § 1201(a).

49.     Defendant employed automated systems and tools designed to bypass YouTube's TPMs by replicating and manipulating authorized request flows while avoiding enforcement mechanisms. These actions allowed Defendant to avoid, bypass, and impair technological measures that otherwise restrict access to audiovisual works, thereby constituting circumvention under 17 U.S.C. § 1201(a)(3)(A).

***TPM No. 1 - Rolling cipher***

50.     YouTube controls access to the underlying media file by withholding a usable file location unless the requesting client can transform an obfuscated signature parameter using proprietary logic embedded in the official YouTube player. The playback data delivered to users contains a scrambled signature that must be processed to produce a valid media request URL. Without performing this authorized transformation, the server will not deliver the audiovisual file. Thus, the rolling cipher controls access by requiring application of a specific computational process before the file can be obtained at all.

51.    YouTube's rolling cipher encryption measure acts as a digital lock, controlling access to content by protecting against unauthorized downloading of underlying media files. YouTube maintains two different URLs for any given video: the page URL, visible to the user, is for the webpage where the video playback occurs, and the file URL, not visible to the user, is for the video file itself that is played within the page. The file URL is encrypted using a complex and periodically changing algorithm – the rolling cipher – that is designed to impede external access to the underlying YouTube files. YouTube's player software uses a decryption routine to authenticate requests and deliver content only through approved interfaces. This TPM inhibits access to the underlying audiovisual files for the purposes of any downloading, copying or distribution of the audiovisual content. In other words, the rolling cipher controls access to copies of audiovisual content uploaded to the platform and impedes an ordinary user from creating a permanent, unrestricted download of audiovisual content made available on YouTube only for streaming and restricted downloading.

52.    The rolling cipher is a TPM measure within the meaning of 17 U.S.C. §1201(a) because it "effectively controls access" to copyrighted works by preventing users access to the files of video streams without first executing YouTube's proprietary decryption code.

***TPM No. 2 - IP blocking and rate limiting***

53.    YouTube monitors network behavior and restricts access when excessive or abusive request patterns are detected. When YouTube detects abnormal request volume originating from a particular IP address, it does not merely limit downloading. It blocks that IP address from accessing the YouTube platform entirely. A blocked IP address cannot stream, browse, or retrieve any content from YouTube's servers. This mechanism therefore functions as a platform-wide access control: it conditions continued access to all content on the platform on compliance with YouTube's authorized access parameters and blocks certain types of users (those who

have violated terms of service) from YouTube's website.

54.    YouTube's infrastructure monitors the number and frequency of requests originating from individual IP addresses against defined thresholds. Once those thresholds are exceeded, YouTube's servers cut off platform access from the offending IP address entirely, preventing any further retrieval of audiovisual content from that source. This system serves a gatekeeping function that extends beyond any individual video or file. It controls whether a requester may access YouTube's content at all.

55.    This IP-based access control is a TPM within the meaning of 17 U.S.C. §1201(a) because it "effectively controls access" to copyrighted works by conditioning platform-level access on compliance with YouTube's authorized request parameters, and by terminating all access, not merely download access, upon detection of unauthorized activity.

***TPM No. 3 - Session-bound, short-lived URLs***

56.    Even after a valid media URL is generated, YouTube restricts access by issuing URLs that are temporary, cryptographically signed, and tied to a particular playback session and client context. These URLs include authorization parameters such as expiration timestamps and client identifiers. Once the authorization window expires or the session ends, the server will refuse to deliver the audiovisual file in response to that URL. Accordingly, possession of a previously valid link does not provide continuing access to the file, and new authorization must be obtained to retrieve it. This mechanism therefore controls access by limiting when and from where the file may be requested.

57.    Because session-bound URLs expire automatically, any automated system attempting to access videos outside ordinary playback cannot rely on a static link and must instead repeatedly obtain fresh authorization parameters and regenerate valid media URLs. By programmatically renewing expired credentials and initiating new authorized sessions at machine speed, automated scraping tools can maintain

11
CONSOLIDATED CLASS ACTION COMPLAINT

continuous access to audiovisual files that would otherwise become unavailable once the original authorization lapses. This conduct circumvents the temporal and session-based restrictions imposed by YouTube and allows persistent retrieval of files in a manner not available to ordinary users. Circumventing this measure constitutes circumvention of a technological measure that effectively controls access to a copyrighted work in violation of 17 U.S.C. § 1201(a).

### *TPM No. 4 - CAPTCHA challenges*

58.    When traffic patterns indicate automated or suspicious activity, YouTube typically requires completion of a CAPTCHA challenge before allowing further requests to proceed. CAPTCHAs are tests designed to separate human users from bots, often requiring identification of objects in grainy images. Until the challenge is successfully completed, the requesting client cannot stream the audiovisual work. CAPTCHAs therefore perform a gatekeeping function by prohibiting a certain type of user (a bot) from accessing the platform and the audiovisual works hosted on it.

59.    Large-scale scraping operations like Defendant's necessarily generate request patterns that trigger CAPTCHA challenges. Rather than completing those challenges, automated systems circumvent them by rotating IP addresses. IP rotation allows an automated system to abandon an IP address at the moment a CAPTCHA challenge is triggered and immediately resume platform access from a new IP address, bypassing the human-verification requirement entirely without ever responding to it. The new IP address presents to YouTube's servers as a fresh, undetected requester, allowing uninterrupted access to audiovisual content that YouTube's CAPTCHA mechanism was designed to gate.

60.    IP rotation therefore defeats both TPM No. 2 and TPM No. 4 through the same mechanism. When YouTube's IP-based monitoring system detects abnormal request volume and moves to cut off platform access, IP rotation prevents that access control from taking effect by substituting a new IP address before the

block can be enforced. When YouTube's CAPTCHA system moves to verify human interaction, IP rotation bypasses that verification gate by escaping to a new IP address. In both cases, the circumvention is affirmative and technological. It is not mere disregard of a restriction, but active manipulation of the access environment to prevent YouTube's controls from operating as designed.

61.    At the scale required to compile datasets (such as HD-VILA-100M or Panda-70M) comprising hundreds of millions of video clips, IP rotation was not optional. YouTube's IP-based access controls and CAPTCHA enforcement would have halted any such operation long before completion absent systematic circumvention. The use of IP rotation at that scale constitutes circumvention of technological measures that effectively control access to copyrighted works in violation of 17 U.S.C. §1201(a).

### TPM No. 5 - Proof-of-origin tokens

62.    YouTube further restricts access to its platform by requiring that all requests for video segments include cryptographic proof-of-origin tokens that validate the request as originating from an authorized YouTube playback environment. These tokens are generated dynamically by YouTube's official player software during an active, authenticated playback session. The token generation process ties each token to specific session parameters, including the client identity, the playback context, and a time-bounded authorization window. YouTube's servers validate these tokens before delivering any audiovisual data. Requests that lack a valid token, present an expired token, or present a token generated outside an authorized playback context are refused. No audiovisual file data is delivered absent successful token validation.

63.    Because proof-of-origin tokens are generated exclusively within YouTube's authorized player environment and are cryptographically bound to that environment, software operating outside that environment cannot obtain valid tokens through ordinary means. To retrieve audiovisual files at scale, automated scraping

tools must affirmatively extract, replicate, spoof, or systematically reuse token parameters generated within authorized sessions. This requires the automated tool to interact with YouTube's player infrastructure specifically to harvest the credentials that YouTube's servers require before delivering content, and then to present those credentials outside the authorized context for which they were generated.

64.    Descrambling tools such as yt-dlp are specifically designed to access, extract, and reuse these session-bound authorization parameters. By parsing YouTube's player response and extracting the token parameters required for server authentication, descrambling tools obtain and reuse credentials that YouTube's token system generates exclusively for authorized playback sessions. This allows descrambling tools to present valid-appearing proof-of-origin credentials to YouTube's servers while operating entirely outside the authorized playback environment those credentials were designed to authenticate. Without this extraction and reuse of token parameters, YouTube's servers would refuse to deliver the requested audiovisual files. Because YouTube's session-level anomaly detection can invalidate token generation for sessions exhibiting suspicious behavior, Defendant's IP rotation practices served the additional function of enabling continuous generation of new authorized sessions from which fresh proof-of-origin tokens could be harvested, allowing uninterrupted access to audiovisual file data at scale.

65.    The proof-of-origin token system is a TPM within the meaning of 17 U.S.C. §1201(a) because it effectively controls access to copyrighted works by conditioning the delivery of audiovisual file data on cryptographic proof that the requester is operating within YouTube's authorized playback environment. Defendant's extraction and reuse of those tokens outside of their authorized context constitutes circumvention of a technological measure that effectively controls access to copyrighted works in violation of 17 U.S.C. §1201(a).

/ / /

/ / /

14
CONSOLIDATED CLASS ACTION COMPLAINT

**B.    YouTube's Terms of Service Reinforce their Technological Protection Measures**

66.    YouTube's Terms of Service describe and reinforce YouTube's TPMs. YouTube's Terms of Service expressly prohibit scraping, unauthorized downloading, bulk extraction, or other forms of data mining of audiovisual content except through expressly permitted features or licensed APIs. These contractual restrictions operate together with YouTube's TPMs to prevent unlicensed access to creators' videos.

67.    According to YouTube's Terms of Service, content creators such as Plaintiffs who upload content onto YouTube grant license to YouTube for certain uses as well as to other users of YouTube to access content through YouTube's services; however, the license makes clear that it "does not grant any rights or permissions for a user to make use of [the] Content independent of the Service."[1]

68.    This language confirms that, while users may view (*i.e.*, stream) audiovisual works through YouTube's controlled environment, they are granted no other rights to use, exploit, or access the copyrighted works. YouTube's Terms of Service reflect YouTube's intent to use the TPMs described above to restrict access to the digital files underlying the videos that YouTube's users are allowed to stream through YouTube's platform.

69.    Streaming through YouTube and downloading permanent copies provide the user with different value propositions—watching and listening for free but seeing ads, versus possessing a permanent digital copy.

70.    Accordingly, scraping or bulk downloading is not merely copying material already provided; it is an act of unauthorized access to data files that YouTube affirmatively withholds from public download.

71.    In fact, during a Bloomberg interview about OpenAI (another generative text-to-video artificial intelligence competitor) scraping YouTube's CEO, Neal Mohan, confirmed that unauthorized scraping constitutes a violation of creators'

---

[1] "Terms of Service," YouTube, https://www.youtube.com/t/terms (last viewed March 11, 2026).

15
CONSOLIDATED CLASS ACTION COMPLAINT

rights and YouTube's Terms of Service, stating: "From a creator's perspective, when a creator uploads their hard work to our platform, they have certain expectations. One of those expectations is that the terms of service is going to be abided by," Mohan said, "It does not allow for things like transcripts or video bits to be downloaded, and that is a clear violation of our terms of service. Those are the rules of the road in terms of content on our platform."[2]

72. The scraping and acquisition processes used by Defendant to circumvent YouTube's TPMs were inconsistent with, and in violation of, YouTube's Terms of Service, which forbid scraping and mass downloading of videos.[3]

73. Although YouTube offers downloading options to subscribers who pay for YouTube's "Premium" plan, YouTube still employs TPMs to restrict access. Specifically, YouTube prohibits all downloading audiovisual content except to the YouTube app. Further, the "download" option only makes audiovisual content available for offline streaming—it does not provide the Premium subscriber with the ability to use the audiovisual file outside of this controlled environment. These controls are akin to encryption measures on a DVD that prohibit its use on unauthorized players. Accordingly, YouTube ensures the audiovisual files cannot be transferred to any other device, but remain only for streaming on the app. Finally, the files are available only for offline streaming for a limited amount of time, at which point they will become available only for online streaming once again. For users who do not have a "Premium" plan, the "download" option on YouTube's player page is non-functional.

74. YouTube's Terms of Service and policies reinforce the variety of TPMs

---

[2] Davey Alba & Emily Chang, *YouTube Says OpenAI Training Sora With Its Videos Would Break Rules*, Bloomberg (Apr. 4, 2024), https://www.bloomberg.com/news/articles/2024-04-04/youtube-says-openai-training-sora-with-its-videos-would-break-the-rules (video available at https://www.youtube.com/watch?v=FBZ__BeChRg).
[3] *Supra*, note 1 (prohibiting "access, reproduce, download, distribute, transmit, broadcast, display, sell, license, alter, modify or otherwise use any part of the Service or any Content except: (a) as expressly authorized by the Service; or (b) with prior written permission from YouTube and, if applicable, the respective rights holders;").

YouTube implements to restrict access to Plaintiffs' and Class Members' underlying audiovisual files.

**C.    Defendant Improperly Circumvented YouTube's Technological Protection Measures to Obtain Millions of YouTube Videos to Train Its Foundational AI Model.**

75.     As noted above, Defendant requires significant amounts of data to feed, train, improve, and commercialize Snap AI Video.

76.     Without authorization, Defendant accessed Plaintiffs' and Class Members' audiovisual content from YouTube for use in its training data for Snap AI Video. To do so, Defendant unlawfully circumvented YouTube's TPMs that YouTube implemented in its effort to impede the downloading of audiovisual content from its platform.

77.     Snap AI Video is not a research tool. It is Defendant's commercialized text-to-video generative AI vehicle. Defendant publicly announced a commercial AI video generation product for creators built on its own foundational video models. A Snap spokesperson confirmed that the tool is "powered by Snap's own foundational video models," and that select creators could generate AI videos from text prompts, with image prompt support to follow.[4]

78.     Because Snap AI Video models are a core feature of Defendant's future plans, Defendant had an overwhelming incentive to acquire training data on an unprecedented scale. Rather than negotiate for lawful licenses, Defendant broke through YouTube's access protections to access the underlying files needed to utilize the massive datasets necessary to fuel Snap AI Video and, by extension, Defendant's broader product lines.

79.     Defendant has sought to develop Snap AI Video so it is capable of, among other things, turning language prompts into audiovisual content. In other

---

[4] *Snap is Introducing an AI Video-Generation Tool for Creators*, TechCrunch (Sept. 17, 2024), https://techcrunch.com/2024/09/17/snap-is-introducing-an-ai-video-generation-tool-for-creators/.

words, Defendant has sought to, and has had success with, creating an AI product that accepts language instruction and produces a video based on that instruction.

80.     Two datasets are central to Defendant's unlawful acquisition of training data for Snap AI Video: HD-VILA-100M, a dataset compiled by Microsoft Research Asia from millions of YouTube videos; and Panda-70M, a derivative dataset compiled by Defendant's own researchers using HD-VILA-100M as its foundation.

81.     Both datasets consist entirely of pointers to YouTube content. Neither contains the underlying audiovisual files. To use either dataset for AI training, a company must access, retrieve, and download every referenced video directly from YouTube—an act that requires circumventing YouTube's TPMs at scale.

82.     YouTube allows users to stream content but prohibits, through contractual terms and TPMs, accessing the underlying video file of the content it streams. Defendant obtained unauthorized access to audiovisual content by unlawfully accessing and stream ripping—*i.e.*, converting streaming content into permanent, locally stored files—and by circumventing the TPMs specifically designed to prevent such access.

83.     Each of the datasets functions as a map or index file identifying specific YouTube videos and clips by URL, video identifier, and timestamp. A single YouTube video may be divided into numerous clips, each treated as a separate training sample. Extracting any clip requires independently accessing the source video on YouTube and isolating the designated segment, a process that constitutes a separate act of circumvention for each clip retrieved.

84.     The HD-VILA-100M dataset is comprised of references to roughly 100 million clips that were derived from 3,098,462 YouTube videos. Each clip represents a distinct segment of the original work. The dataset was compiled by Microsoft Research Asia and published in 2021 for research involving video-based AI models.[5]

---

[5] Hongwei Xue et al., *Advancing High-Resolution Video-Language Representation with Large Scale Video Transcriptions*, arXiv:2111.10337 (Nov. 19, 2021), https://arxiv.org/abs/2111.10337.

CONSOLIDATED CLASS ACTION COMPLAINT

It lists pointers to YouTube videos and includes subtitle information extracted from YouTube's closed captioning system.

85. The usage license on the dataset states it was created "solely for Computational Use for non-commercial research" and that users "may not use the Data or any Results in any commercial offering, including as part of a product or service (or to improve any product or service) you use or provide to others."[6]

86. HD-VILA-100M does not contain the video files themselves. Any user of the dataset must download each referenced clip directly from YouTube. Defendant did so at scale, which triggered at least 100 million separate acts of unauthorized access and copying.

87. By including these limitations on its usage license, Microsoft implicitly acknowledged that the HD-VILA-100M dataset is comprised of protected, copyrighted works obtained without license, permission, or authorization.

88. Defendant obtained the dataset that was earmarked for non-commercial use only, including the HD-VILA-100M dataset. Defendant was aware that the datasets were for research purposes only but used the datasets for commercial development (*i.e.*, "training") of its generative AI model. Further, Defendant used the HD-VILA-100M dataset to scrape audiovisual content from YouTube without the consent of YouTube or the creators of the audiovisual content.

89. Defendant also created and published Panda-70M, a derivative dataset built directly on HD-VILA-100M as its foundation. Panda-70M was created by curating 3.8 million high-resolution videos from the HD-VILA-100M dataset and splitting them into approximately 70.8 million semantically consistent video clips, each paired with AI-generated text captions.

90. Panda-70M was compiled by Defendant's employees, several of whom

---

[6] *Research Use of Data Agreement, Version 1.0*, Microsoft, https://github.com/microsoft/XPretrain/blob/main/hd-vila-100m/LICENSE (last visited April 1, 2026).

are also co-authors of the Snap AI Video paper, and was released in 2024.[7] In a remarkable act of institutional irony, Defendant then published Panda-70M as an open-access blueprint (a detailed, step-by-step methodology for stream ripping millions of YouTube videos) while purporting to launder its own unlawful conduct by restricting downstream users to "non-commercial, research purposes only" and disclaiming that "[n]o commercial license, whether implied or otherwise, is granted in or to this dataset and code, unless you have entered into a separate agreement with Snap Inc. for such rights."[8]

91.    In other words, having itself circumvented YouTube's TPMs and copied millions of protected works without authorization or compensation, Defendant handed the world a roadmap for doing the same; then absolved itself of responsibility by declaring the theft permissible so long as others kept it academic. Snap had no rights to grant or withhold. The underlying videos belong to the YouTube creators whose content Snap had already unlawfully circumvented and copied.

92.    The HDVILA-100M and Panda 70M datasets consist of location identifiers that point to millions of YouTube videos or clips. None of them contains the underlying audiovisual files. To use them in training, a company must access, retrieve and download every referenced video directly from YouTube. Defendant used these datasets to initiate millions of individual downloads of protected YouTube content, all without authorization or compensation, all in violation of YouTube's TPMs, and all for the commercial purpose of building its foundational video model.

93.    Plaintiffs do not yet know the full extent of all datasets Defendant used to train Snap AI Video and any derivative, adjacent commercial tool, or successor models. The identity, contents, sources, and provenance of all training datasets are exclusively within Defendant's possession, custody, and control. On information and

---

[7] Tsai-Shien Chen et al., *Panda-70M: Captioning 70M Videos with Multiple Cross-Modality Teachers*, arXiv:2402.19479 (Feb. 29, 2024), https://arxiv.org/abs/2402.19479.
[8] Panda-70M Project Page, Snap Research, https://snap-research.github.io/Panda-70M/

belief, Defendant used additional datasets beyond those publicly disclosed that incorporated YouTube-sourced content obtained through the same circumvention processes alleged herein. The full scope of Defendant's unlawful data acquisition, including any datasets, scraping pipelines, or third-party data purchases that incorporated YouTube-sourced content, will be the subject of discovery.

### D. Defendant's Automated Scraping Required Circumvention of YouTube's Technological Protection Measures.

94. Bulk extraction of YouTube videos at the scale alleged here cannot occur without circumventing YouTube's layered TPMs, each of which independently controls access to the underlying audiovisual files. Illicit tools and services are specifically designed to defeat these protections, enabling automated systems to retrieve permanent copies of content that YouTube makes available only for streaming. This process is commonly known as "scraping" or "stream ripping." Under DMCA § 1201(a), circumvention of any single technological measure that effectively controls access to a copyrighted work is sufficient to establish liability. YouTube's protections are layered and overlapping, and the circumvention of one does not negate the effectiveness or legal significance of the others.

95. "Scraping" or "stream ripping" content involves the automated accessing and downloading of audio and video files directly from a website's servers rather than viewing the content through the provider's authorized playback environment.

96. Upon information and belief, in order to acquire "high-quality text-to-video generation," Defendant, directly and through agents, contractors, and affiliates, intentionally accessed large volumes of YouTube videos by scraping and/or using tools and workflows that bypass or evade YouTube's TPMs and usage restrictions, and then reproduced those videos to assemble training corpora for Defendant's AI models and services.

97. When Defendant scraped audio and video files from YouTube,

21
CONSOLIDATED CLASS ACTION COMPLAINT

Defendant did not simply access and download those files onto the YouTube app for offline streaming, as envisioned by YouTube's Premium plan. Instead, Defendant improperly accessed the underlying audio and video files and downloaded those files into Defendant's own system, where Defendant had access over the files and where Defendant could store them indefinitely. These actions circumvented YouTube's TPMs, violated YouTube's Terms of Service, and are inconsistent with the access provided by YouTube's Premium plan.

98. Upon information and belief, Defendant also obtained its own separate audiovisual datasets directly through its own independent scraping of YouTube's video sharing platform.

99. To retrieve audiovisual files at scale, Defendant was required to defeat TPM No. 1, the rolling cipher that protects the true media file URL. On information and belief, Defendant used one or more descrambling tools designed to defeat YouTube's proprietary signature-transformation logic, allowing automated systems to generate valid file requests outside the authorized player environment and thereby obtain the underlying media files directly. Such tools include, for example, the open-source program yt-dlp, which is specifically engineered to descramble, replicate, or extract YouTube's proprietary signature-transformation logic and circumvent the access controls YouTube uses to prevent unauthorized downloading.

100. A descrambling tool such as yt-dlp works by replicating or extracting the signature-transformation process that YouTube uses to protect its media URLs, allowing a user to bypass the authorized streaming environment entirely and retrieve the underlying video and audio files directly from YouTube's servers. Tools of this kind can be used to automatically merge separate audio and video streams and to download entire playlists at scale. On information and belief, Defendant used yt-dlp or a substantially similar descrambling tool for precisely this purpose.

101. To deploy a descrambling tool such as yt-dlp, a user must first obtain and configure the program, along with ancillary software necessary to merge video

and audio streams into complete audiovisual files. Once configured, the tool can be directed at individual videos or entire playlists by supplying the URL for each target video. The result is a complete audiovisual file retrieved outside of and in circumvention of YouTube's authorized playback environment.

102.   In simpler terms, a descrambling tool such as yt-dlp acts as a bootleg key for the lock imposed by YouTube's rolling cipher. On information and belief, Defendant used yt-dlp or a substantially similar tool to improperly access and download audiovisual files from YouTube and merge them into complete audiovisual packages for ingestion into their generative AI training pipeline.

103.   Defendant also defeated TPM No. 2, YouTube's IP-based monitoring and blocking system, which functions as a platform-wide access control. When YouTube detects automated activity from a particular IP address and blocks it, that IP address loses access to the entire YouTube platform. It cannot stream, browse, or retrieve any audiovisual content whatsoever. On information and belief, Defendant implemented an IP rotation scheme specifically to defeat this platform-wide access control. When YouTube detected automated activity and blocked one IP address, Defendant's operation immediately resumed from a new IP address, presenting to YouTube's servers as a fresh, undetected requester with full platform access restored.

104.   YouTube uses automated programs to monitor request volume and behavior from individual IP addresses, detect high-volume access patterns, and block those IP addresses from any further access to content on the platform. An IP rotation scheme is specifically designed to defeat this access control by cycling through different IP addresses to avoid detection and blocking before platform access can be terminated.

105.   Executing an IP-rotation scheme at the scale necessary to download the volume of files indexed in any one of the datasets and required to train Snap AI Video necessarily required the use of virtual machines or substantially similar infrastructure. A single physical machine with a fixed IP address would have been

detected and blocked almost immediately given the volume of requests involved. On information and belief, Defendant deployed virtual machines, cloud computing infrastructure, or substantially similar technology to rotate IP addresses at scale, ensuring that when YouTube detected and blocked one address, Defendant's downloading operation could immediately resume from another.

106. On information and belief, by repeatedly cycling through IP addresses in this manner, Defendant ensured that their automated downloading operation could continue uninterrupted even after YouTube detected and blocked individual addresses. The sheer volume of videos necessary to train Snap AI Video makes any alternative explanation implausible. The full details of the specific infrastructure Defendant used to execute this scheme will be the subject of discovery.

107. IP rotation was not merely a mechanism for circumventing TPM No. 2. It served as a unified circumvention method that defeated multiple TPMs simultaneously. Specifically, IP rotation also circumvented TPM No. 4 and supported circumvention of TPM N. 5, as described below.

108. Processes such as these allowed Defendant to bypass YouTube's player page and avoid YouTube's monitoring systems in order to access and scrape content from YouTube.

109. Defendant's conduct necessarily circumvented TPM No. 3, the use of session-bound, short-lived media URLs. Because these URLs expire and cannot be reused, automated tools must repeatedly obtain fresh authorization parameters and regenerate valid links in order to continue accessing files. By programmatically renewing access credentials outside ordinary playback sessions, Defendant maintained uninterrupted access to files that would otherwise become unavailable once the original authorization lapsed.

110. At scale, Defendant's automated activity would also trigger TPM No. 4, CAPTCHA challenges intended to condition continued platform access on proof of human interaction. Rather than completing those challenges, Defendant's

infrastructure defeated them through IP rotation. At the moment a CAPTCHA challenge was triggered against a particular IP address, Defendant's operation rotated to a new IP address, presenting to YouTube's servers as a fresh, undetected requester and bypassing the human-verification requirement entirely without ever responding to it. This is not passive disregard of a restriction. It is affirmative technological manipulation of the access environment that prevented YouTube's CAPTCHA controls from operating as designed. Defendant's infrastructure thereby obtained continuous access to audiovisual content without the human interaction that YouTube requires for continued platform access.

111. IP rotation further supported Defendant's circumvention of TPM No. 5, YouTube's proof-of-origin token system. Because YouTube's session-level anomaly detection can invalidate token generation for sessions exhibiting suspicious behavior, Defendant's IP rotation practices enabled continuous generation of new authorized sessions from which fresh proof-of-origin tokens could be harvested. By rotating to a new IP address whenever session-level anomaly detection threatened to cut off the token supply, Defendant ensured uninterrupted access to the valid credentials required to obtain audiovisual file data from YouTube's servers.

112. Defendant further circumvented TPM No. 5 by extracting, replicating, or reusing proof-of-origin token parameters outside the authorized playback environment for which they were generated. YouTube's proof-of-origin token system requires requests for video segments to present credentials demonstrating that they originate from an authorized playback environment. Automated downloading tools operate outside that environment and therefore must access, extract, replicate, or reuse the necessary request parameters in order to retrieve video data directly. By presenting those credentials outside their intended context, Defendant accessed and obtained audiovisual files that YouTube's token system was designed to deliver only to approved clients.

113. To be clear, Defendant's generative AI models are not "watching"

YouTube in order to be trained. Rather, data improperly accessed and downloaded from YouTube is being uploaded into Defendant's generative AI models to develop and improve Defendant's products.

114.   Defendant knew or should have known its conduct violated YouTube's TPMs.

115.   Defendant's actions constitute a violation of the DMCA's anti-circumvention provisions, which state, among other things, that "[n]o person shall circumvent a technological measure that effectively controls access to a work protected under this title." 17 U.S.C. § 1201(a)(1)(a).

### E.   Defendant's Actions Caused Harm to Plaintiffs and Class Members

116.   At no time did Defendant seek or obtain Plaintiffs' or Class Members' authorization to access and use the videos Defendant used to train its generative AI models.

117.   At no time did Defendant seek or obtain Plaintiffs' or Class Members' authorization, nor did Defendant compensate Plaintiffs or the Class Members for the access, copying, ingestion, and use of their YouTube videos in AI training and related workflows.

118.   Plaintiffs and Class Members used YouTube as their platform of choice to upload their video content in substantial part due to YouTube's protective measures, including TPMs and Terms of Service, that prohibit the type of scraping, unauthorized accessing and downloading, bulk extraction, and other forms of data mining of audiovisual content utilized by Defendant to obtain Plaintiffs' video content.

119.   Plaintiffs and Class Members suffered concrete and particularized economic injuries that are distinct from the bare statutory violation. These injuries take six independent forms, each of which is sufficient to establish Article III and statutory standing.

120.    First, Plaintiffs and Class Members who participate in YouTube's Partner Program lost per-view advertising revenue that YouTube's monetization system would otherwise have generated. YouTube's advertising model operates as follows: viewers who access content through YouTube's authorized streaming environment without a Premium subscription are served advertisements; YouTube remits a share of the resulting advertising revenue to content creators. Each authorized stream by a non-Premium viewer generates a monetizable advertising impression that feeds this revenue-sharing system. Stream ripping extracts the underlying video file entirely outside YouTube's authorized playback environment. When Defendant accessed Plaintiffs' videos by circumventing YouTube's TPMs, those retrievals generated no advertising impressions and no advertising revenue for Plaintiffs and Class Members. The economic value that Plaintiffs and Class Members would have received had Defendant engaged in any authorized form of access, including licensing the content directly, was instead extracted with no benefits to Plaintiffs and Class Members associated with authorized viewing.

121.    Second, Plaintiffs and Class Members lost YouTube Premium revenue that YouTube's subscription monetization system would otherwise have generated. When a viewer accesses content through YouTube's authorized streaming environment as a YouTube Premium subscriber, no advertisement is served. Instead, YouTube shares a portion of the viewer's monthly membership fee with the creator, compensating the creator for the view in lieu of advertising revenue.[9] YouTube Premium thereby gives creators a secondary revenue stream in addition to advertising revenue. This revenue is allocated based on watch time: YouTube distributes Premium membership revenue to creators based on how much watch time they earn from Premium subscribers. Creators collectively receive 55% of YouTube Premium subscription revenue, with individual payouts determined by each channel's share of

---

[9] YouTube, *How YouTube Premium supports creators*, Google Support, https://support.google.com/youtube/answer/7060016?hl=en (last visited April 9, 2026).

total Premium watch time. Because Defendant accessed Plaintiffs' content entirely outside YouTube's authorized streaming environment, no Premium watch time was recorded and no Premium subscription revenue was allocated to Plaintiffs or Class Members. Every video retrieved by Defendant through circumvention of YouTube's TPMs represents a loss of both advertising revenue and Premium subscription revenue that authorized access would have generated.

122. Third, Plaintiffs and Class Members who had not yet qualified for YouTube's Partner Program at the time of Defendant's conduct suffered direct economic injury to their monetization prospects. YouTube conditions Partner Program eligibility on a channel accumulating minimum thresholds of watch hours and subscribers. Each view generated through YouTube's authorized streaming environment counts toward satisfying those thresholds and carries direct, measurable economic value as progress toward monetization eligibility. Because Defendant accessed Plaintiffs' content through automated tools that bypassed YouTube's streaming infrastructure entirely, no view count was registered and no watch time accumulated. Plaintiffs and Class Members were thereby deprived of view counts and watch hours that would otherwise have contributed to Partner Program qualification, delaying or impairing their ability to monetize their channels.

123. Fourth, all Plaintiffs and Class Members, regardless of monetization status, suffered economic injury through the loss of algorithmic amplification. YouTube's recommendation algorithm uses view counts, watch time, and engagement metrics to determine which videos to surface to new audiences. Legitimate streaming views generate algorithmic signals that drive organic channel growth, subscriber acquisition, and expanded audience reach, each of which translates directly into economic value for the content creator. Because Defendant's automated tools bypassed YouTube's streaming infrastructure entirely, no view count was registered, no watch time accumulated, and no algorithmic signal was generated. Plaintiffs and Class Members were thereby deprived of the organic

growth, subscriber acquisition, and expanded monetization potential that legitimate streaming of the same content would have produced. This injury extends to every Class Member who uploaded content to YouTube, regardless of whether their channel was enrolled in the Partner Program at the time of Defendant's conduct.

124.  Fifth, Defendant's conduct also caused concrete harm to the market for Plaintiffs' and Class Members' content. Instead of seeking to purchase a copy of the audiovisual file from the Plaintiffs and members of the Class, Defendant choose to illegally download a copy free, by bypassing the technological protection measures preventing such access on YouTube's platform.

125.  Sixth, Plaintiffs and Class Members suffered injury in the loss of control of their works. The DMCA's purpose, in large part, was to encourage content creators to make their works available on the internet without fear of losing total control over them, as the loss of control over digital files embodying copyrighted works—e.g., the audiovisual files at issue here—effectively undermines any ability to ensure that they are fairly compensated for exploitation of their works. That is especially true here, where Defendant had ripped their audiovisual files, retains copies of them, and yet Plaintiffs and the Class have no visibility into how and for what purpose Defendant continues to exploit their copyrighted content without any compensation.

126.  As a direct and proximate result of Defendant's circumvention, Plaintiff has suffered actual damages, including loss of control over his copyrighted works, impairment of market value, and costs incurred to identify, remove, and prevent further distribution of the infringing content. This harm to the value and market for Plaintiffs' works constitutes a concrete, non-speculative injury sufficient to establish Article III standing independent of any statutory damages.

127.  The statute of limitations for claims under 17 U.S.C. § 1201 is three years from the date the claim accrued. *See* 17 U.S.C. § 1203(c). A claim under § 1201 accrues when the circumvention occurs, that is, when the defendant actually retrieves protected content by defeating the applicable technological protection measures. The

datasets identified herein contain no audiovisual files—only references to such audiovisual files. No circumvention therefore occurred when any such dataset was published. The actionable conduct is Defendant's use of each dataset to access, stream rip, and download the referenced videos directly from YouTube. That circumvention occurred when Defendant retrieved each video file, and each such retrieval constitutes a separate act of circumvention. The date of publication of any dataset is legally irrelevant to accrual. To the extent any act of circumvention falls within the three-year period preceding the filing of this complaint, this action is timely on its face. To the extent any act of circumvention predates that period, the limitations period is independently tolled as alleged below.

128. Further, the vast majority of Class Members did not have actual notice of their claims as of the paper's publication date, and most remain unaware today. The HD-VILA-100M and Panda-70M datasets contains references to over 170 million video clips drawn from over 6 million YouTube videos. The dataset does not identify content creators by name, channel, or any other human-readable identifier. It consists of raw URLs and video identifiers. To determine whether any particular video in the dataset belongs to a given creator, that creator would need to individually access each URL, view the corresponding video, and determine whether it is their own work. No individual content creator could reasonably be expected to audit over 170 million URLs to discover that their content was included.

129. Defendant possessed complete knowledge of which videos it downloaded and from which creators those videos originated. Defendant never disclosed that information to Plaintiffs or Class Members. The burden of discovery fell entirely on creators who had no reason to suspect their content had been used and no practical means of confirming it without individually reviewing over 100 million URL references, none of which identifies any creator by name.

130. The doctrine of fraudulent concealment independently tolls the limitations period. A citation to a dataset of pointers does not place a plaintiff on

inquiry notice of a circumvention claim. The circumvention act is the unauthorized access of the files, not the citation to the map used to locate them. Defendant concealed the tools, infrastructure, and methods it used to defeat YouTube's TPMs, and that concealment prevented Plaintiffs and Class Members from discovering the facts necessary to assert a § 1201 claim.

131. Plaintiffs and Class Members exercised reasonable diligence in investigating their claims. The technical process by which AI training datasets are compiled, and the distinction between a dataset of pointers and the act of retrieving the underlying files through circumvention, is not information available through ordinary inquiry by content creators. Defendant possessed, and continues to possess, exclusive knowledge of the specific tools, infrastructure, and processes it used to retrieve audiovisual files from YouTube. The limitations period is therefore tolled under the fraudulent concealment doctrine from the date of accrual until the date Plaintiffs discovered, or through reasonable diligence could have discovered, the facts giving rise to the claim.

## **CLASS ACTION ALLEGATIONS**

132. **Class Definition:** Plaintiffs bring this action on behalf of themselves and other similarly situated individuals defined as follows:

> **All persons and entities whose videos were posted on YouTube and that Defendant accessed at the file level by scraping, downloading, or otherwise extracting underlying video files from YouTube (the "Class").**

133. The "Class Period" is the period beginning on the date established by the Court's determination of any applicable statute of limitations, after consideration of any tolling, concealment, and accrual issues, and ending on the date of entry of judgement or preliminary approval of a settlement.

134. Excluded from the Class are Defendant; any affiliate, parent, or subsidiary of Defendant; any entity in which Defendant has a controlling interest; any officer director, or employee of Defendant; any successor or assign of Defendant;

anyone employed by counsel in this action; any judge to whom this case is assigned, his or her spouse and immediate family members; and members of the judge's staff.

135. Plaintiffs reserve the right to modify the class definitions or add sub-classes as needed prior to filing a motion for class certification.

136. The proposed Class meets the criteria for certification under Rule 23 of the Federal Rules of Civil Procedure.

137. <u>Numerosity</u>. The Members of the Class are so numerous that joinder of all of them is impracticable. The exact number of Class Members is unknown to Plaintiffs now, but Plaintiffs estimates that there are thousands of Class Members.

138. <u>Commonality</u>. Questions of law and fact common to the Class Members predominate over questions that may affect only individual Class Members because Defendant has acted on grounds generally applicable to the Class. Such generally applicable conduct is inherent in Defendant's wrongful conduct.  The following questions of law and fact are common to the Class:

    a.    Whether YouTube employs TPMs "that effectively control access" to copyrighted audiovisual works within the meaning of 17 U.S.C. § 1201(a);

    b.    Whether Defendant defeated, avoided, bypassed, removed, deactivated, impaired, or otherwise circumvented YouTube's TPMs, including through automated tools used to download or otherwise obtain unauthorized access to the Plaintiffs' and Class Members' copyrighted content on YouTube;

    c.    Whether Defendant's circumvention and/or trafficking conduct was willful, knowing, and undertaken for commercial advantage or private financial gain;

    d.    Whether Defendant retrieved, scraped, downloaded, or otherwise acquired the underlying YouTube videos referenced in HD-VILA-l00M and Panda-70M and any other datasets used by Snapchat at

massive scale to build training material for its AI systems;

     e.    Whether Plaintiffs and Class Members suffered damages from Defendant's misconduct.

139. <u>Typicality</u>. Plaintiffs' claims are typical of those of other Class Members because Plaintiffs' video content, like that of every other Class Member, was made available on YouTube and improperly altered and used by Defendant to train Defendant's generative AI models for commercial purposes. Plaintiffs' claims are typical of those of the other Class Members because, among other things, all Class Members were injured through the common misconduct of Defendant. Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all other Class Members, and no defenses are unique to Plaintiffs. Plaintiffs' claims and those of Class Members arise from the same operative facts and are based on the same legal theories.

140. <u>Adequacy of Representation</u>. Plaintiffs will fairly and adequately represent and protect the interests of the Members of the Class. Plaintiffs' interests coincide with, and not antagonistic to, those of the Class Members. Plaintiffs are represented by attorneys with experience in the prosecution of class action litigation. Plaintiffs' attorneys are committed to vigorously prosecuting this action on behalf of the Class Members.

141. <u>Predominance</u>. Defendant has engaged in a common course of conduct toward Plaintiffs and Class Members, in that Plaintiffs' and Class Members' video content was unlawfully accessed, downloaded, altered and used by Defendant in the same way. The fact that Snap AI Video was a foundational model underscores that Defendant's conduct was uniform across the Class: every video unlawfully accessed from YouTube was ingested into the same core model that underpins Defendant's product ecosystem. This commonality further demonstrates the predominance of shared legal and factual issues among Class Members. The common issues arising from Defendant's conduct affecting Class Members set out above predominate over

any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

142. Superiority. A Class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendant. In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class member.

143. Defendant has acted on grounds that apply generally to the Class as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a Class-wide basis.

144. Ascertainability. Finally, all members of the proposed Class are readily ascertainable. Defendant used datasets that contain the full lists of URLs and video identifiers for every YouTube video incorporated into the training pipeline. Those identifiers allow the parties to determine exactly which videos were used and to match each video to its creator through YouTube's public channel and authorship information. Because the datasets provide a complete map of the videos Defendant downloaded, the identities of the affected creators are identifiable through straightforward reference to the URLs and corresponding channel data.

## CLAIM FOR RELIEF

**Violation of the DMCA (Anti-Circumvention) 17 U.S.C. § 1201(a)**

145. Plaintiffs repeat, reallege, and incorporates the allegations contained in the previous paragraphs as if fully set forth herein.

146.  Plaintiffs and Class Members are owners of YouTube channels that uploaded copyrighted audiovisual works that they own and/or license and are publicly performed through the YouTube platform (collectively, the "Videos"). Plaintiffs and Class Members own all rights, title, and interest in and to the claims asserted in this action, including all claims for violation of 17 U.S.C. § 1201.

147.  YouTube employs TPMs that effectively control access to Plaintiffs' and Class Members' Videos within the meaning of 17 U.S.C. § 1201(a)(3)(B). YouTube's TPMs prohibit scraping, unauthorized downloading, bulk extraction, or other forms of data mining of audiovisual content.

148.  These TPMs require the application of information, processes, and authorized interactions to access the audiovisual works in usable form. These measures function to prevent access to Plaintiffs' Videos outside YouTube's authorized delivery environment. These restrictions prevent unlicensed access to the underlying video files, not simply reproduction of content.

149.  When each of Plaintiffs' and Class Members Videos were published to YouTube, YouTube automatically applied TPMs that control access to and prevent unauthorized access to these audiovisual files.

150.  The plain text of 17 U.S.C. § 1201(a) imposes no requirement that the Plaintiffs and Class Members personally implement the technological protection measure. The statute prohibits circumventing any technological measure that "effectively controls access to a work protected under this title" and does not specify who must have put the measure in place. *See* 17 U.S.C. § 1201(a)(1)(A). The statute defines circumvention and effectiveness by reference to the "authority of the copyright owner," 17 U.S.C. § 1201(a)(3), but that language defines the scope of protected measures, not who is required to deploy them.

151.  Plaintiffs and Class Members, as channel owners who upload their Videos to YouTube, affirmatively authorize YouTube to act as their platform and to deploy the TPMs that protect their content. YouTube's TPMs exist for the explicit

35
CONSOLIDATED CLASS ACTION COMPLAINT

purpose of preventing unauthorized access to Plaintiffs and Class Members Videos and are deployed on behalf of, and for the benefit of, Plaintiffs and Class Members. That YouTube operates the technical infrastructure implementing the TPMs does not diminish the protection those measures provide to Plaintiffs and Class Members as the uploaders of the Videos.

152. Plaintiffs and Class Members are the parties whose Videos were accessed without authorization and whose rights the DMCA's anti-circumvention provisions were designed to protect. Permitting a defendant to escape liability under § 1201 simply because Plaintiffs and Class Members delegated technical implementation of access controls to a hosting platform would gut the statute's protections for anyone who relies on a third-party platform to safeguard their uploads of copyrighted works. The text of § 1201 does not support that result.

153. Defendant knowingly and intentionally circumvented YouTube's TPMs by deploying automated systems designed to avoid, bypass, and impair those TPMs.

154. Defendant used automated tools for the sole purpose of circumventing YouTube's technological barriers that effectively control access to extracted files never made available to the public. Specifically, Defendant employed measures to access, extract, copy, and download Plaintiffs' and Class Members' Videos from YouTube without authorization. In doing so, Defendant improperly obtained millions of the Videos from YouTube's platform.

155. Defendant's conduct constitutes circumvention because it involved the avoidance and bypassing of technological measures that control access to copyrighted works, without the authority of Plaintiffs or the Class Members (*i.e.*, the uploaders).

156. This distinction is critical: viewing a YouTube video through YouTube's authorized and playback mechanisms does not provide access to the underlying file. Defendant's circumvention tools broke through that access barrier, triggering liability under §1201.

157.  Defendant's circumvention acts targeted YouTube's servers, including servers located within the United States. YouTube's content delivery infrastructure is headquartered and substantially operated in the United States. The TPMs at issue, including YouTube's rolling cipher, IP-blocking systems, session authentication, CAPTCHA enforcement, and proof-of-origin tokens, are implemented, maintained, and enforced from systems located within the United States. Every circumvention act Defendant performed was directed at U.S.-based servers and U.S.-operated technological systems. The relevant geographic inquiry is where YouTube's access controls were defeated, which is the United States.

158.  As a direct and proximate result of Defendant's violations, Plaintiffs have been injured and are entitled to all remedies available under 17 U.S.C. § 1203, including statutory damages, injunctive relief, and attorneys' fees.

159.  Plaintiffs and Class Members have been harmed by Defendant's conduct because Defendant has taken their content without authorization or compensation. Defendant's circumvention of YouTube's technological measures has facilitated Defendant's ongoing and mass-scale copyright infringement through its unauthorized and uncompensated use of the content in its training data. Defendant accessed, downloaded, stored and utilized those videos to assemble training corpora for Defendant's AI models and services.

160.  Each act of circumvention constitutes a separate violation of §1201. Plaintiffs and the Class Members are entitled to statutory damages, injunctive relief, impoundment, and attorneys' fees and costs under 17 U.S.C. §1203.

161.  Each of Defendant's acts of infringement is a willful violation as Defendant specifically utilized automated tools designed to evade YouTube's TPMs.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request a judgment in their favor and against Defendant as follows:

    a.    Certification of this action as a class action and appointment of

Plaintiffs and Plaintiffs' counsel to represent the Class;

b.   Declare that Defendant has willfully circumvented the copyright protection systems of YouTube intended to protect Plaintiffs' and the Class Members's audiovisual content.

c.   For statutory damages (up to the maximum allowed by law per violation), injunctive relief, and attorneys' fees and costs under 17 U.S.C. §1203;

d.   For such equitable relief under Title 17, Title 28, and/or the Court's inherent authority as is necessary to prevent or restrain infringement of Plaintiffs' and the Class Members' copyright-protected content, including a preliminary and permanent injunction requiring that Defendant and its officers, agents, servants, employees, attorneys, directors, successors, assigns, licensees, and all others in active concert or participation with any of them, cease infringing, or causing, aiding, enabling, facilitating, encouraging, promoting, inducing, or materially contributing to or participating in the infringement of any of Plaintiff's or the Class Members' exclusive rights under federal law;

e.   For an award of pre-judgment and post-judgment interest, to the fullest extent available, on any monetary award made part of the judgment against Defendant; and

f.   For such other and further relief as the Court may deem just and proper.

/ / /

/ / /

/ / /

/ / /

/ / /

38
CONSOLIDATED CLASS ACTION COMPLAINT

## JURY DEMAND

162.   Plaintiffs demand a trial by jury on all claims for which trial by jury is proper.

Dated: April 13, 2026

Respectfully submitted,

*/s/ Rom Bar-Nissim*
Rom Bar-Nissim (SBN 293356)
**HEAH BAR-NISSIM LLP**
1801 Century Park East, Suite 2400
Los Angeles, CA 90067
Tel: (310) 432-2836
Rom@HeahBarNissim.com

Jarrett Lee Ellzey (*pro hac vice*)
Tom Kherkher (*pro hac vice*)
Leigh S. Montgomery (*pro hac vice*)
**ELLZEY KHERKHER SANFORD MONTGOMERY LLP**
4200 Montrose Street, Suite 200
Houston, TX 77006
JEllzey@EKSM.com
TKherkher@EKSM.com
LMontgomery@EKSM.com

CONSOLIDATED CLASS ACTION COMPLAINT

William J. Edelman (SBN 285177)
**MILBERG, PLLC**
227 W. Monroe Street, Suite 2100
Chicago, IL 60606
Tel: 866.252.0878
wedelman@milberg.com

Michael A. Acciavatti (*pro hac vice* forthcoming)
**MILBERG, PLLC**
405 East 50th Street
New York, NY 10022
Tel: 212.594.5300
macciavatti@milberg.com

*Attorneys for Plaintiffs and the Proposed Class*

CONSOLIDATED CLASS ACTION COMPLAINT