William J. Edelman (CA Bar No. 285177)
MILBERG, PLLC
280 S. Beverly Drive, Penthouse
Beverly Hills, CA 90212
Tel: (771) 474-1121
wedelman@milberg.com

Jarrett Lee Ellzey (admitted *pro hac vice*)
ELLZEY KHERKHER SANFORD
MONTGOMERY LLP
4200 Montrose Street, Suite 200
Houston, TX 77006
JEllzey@EKSM.com

Rohit D. Nath (SBN 316062)
SUSMAN GODFREY L.L.P
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067-2906
Telephone: (310) 789-3100
RNath@susmangodfrey.com

Rom Bar-Nissim (SBN 293356)
HEAH BAR-NISSIM LLP
1801 Century Park East, Suite 2400
Los Angeles, CA 90067
Telephone: (310) 432-2836
Rom@HeahBarNissim.com

*Attorneys for Plaintiffs and the Proposed Class [Additional names in signature]*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## SOUTHERN DIVISION

| | |
|---|---|
| TED ENTERTAINMENT, INC., MATT FISHER, GOLFHOLICS, INC., AND NICOLE CHMURA each individually and on behalf of all others similarly situated,<br><br>    Plaintiffs,<br><br>vs.<br><br>SNAP INC.,<br><br>    Defendant. | Case No. 2:26-cv-00754-AB-MBK<br><br>Honorable André Birotte Jr.<br><br>**PLAINTIFFS' OPPOSITION TO SNAP'S MOTION TO DISMISS**<br><br>Date:  July 10, 2026<br>Time:  10:00 AM PT<br>Place:  Courtroom 7B<br><br>**DEMAND FOR JURY TRIAL**<br>Consolidated Complaint Filed: April 13, 2026 |

## TABLE OF CONTENTS

INTRODUCTION ......................................................................................................... 1

BACKGROUND ........................................................................................................... 4

LEGAL STANDARD ................................................................................................... 8

ARGUMENT ................................................................................................................. 9

I.  Plaintiffs Need Only Allege that YouTube's TPMs Control Access, Not That They Prevent All Viewing ......................................... 9

II.  Snap's Cited Authorities Pre-Date And Conflict With *VidAngel* ........ 15

III.  Plaintiffs Have Plausibly Alleged that YouTube's TPMs "Control Access" to Plaintiffs' Works, and That Snap Circumvented These TPMs ......................................................................... 17

    A.  TPM (1)—Rolling Cipher ......................................................... 18

    B.  TPM (2)—IP blocking ............................................................... 20

    C.  TPM (3)—Session-bound, short-lived URLs ........................... 22

    D.  TPM (4)—CAPTCHA challenges ............................................. 22

    E.  TPM (5)—Proof-of-origin token .............................................. 24

IV.  Plaintiffs Have Sufficiently Alleged the Timing of YouTube's Technological Protections and Snap's Alleged Downloading ............ 24

CONCLUSION ............................................................................................................ 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Advanced Med. Tech. Ass'n v. Library of Congress,*
2025 WL 2029804 (D.D.C. July 21, 2025) ........................................................ 10

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) ........................................................................................... 24

*Ass'n for Info. Media & Equip. v. Regents of the Univ. of California,*
2012 WL 7683452 (C.D. Cal. Nov. 20, 2012) .................................................... 16

*Cordova v. Huneault,*
817 F. Supp. 3d 819 (N.D. Cal. 2026) ................................................ 3, 10, 14, 19

*Couponcabin LLC v. Savings.com, Inc.,*
2016 WL 3181826 (N.D. Ind. June 8, 2016) ..................................... 15, 16, 17, 21

*Craigslist, Inc. v. Naturemarket, Inc.,*
694 F. Supp. 2d 1039 (N.D. Cal. 2010) .............................................................. 23

*Disney Enterprises, Inc. v. VidAngel, Inc.,*
869 F.3d 848 (9th Cir. 2017) ....................................................................*passim*

*Edland v. Basin Elec. Power Coop.,*
2021 WL 3080225 (D.S.D. July 21, 2021) ..................................................... 3, 15

*Green v. United States Dep't of Just.,*
111 F.4th 81 (D.C. Cir. 2024) .................................................................... 1, 4, 5

*Hattler v. Ashton,*
2017 WL 11634742 (C.D. Cal. Apr. 20, 2017) ............................................. 15, 16

*Huckstein v. Blixseth,*
2011 WL 164825 (C.D. Cal. Jan. 19, 2011) ....................................................... 19

*Jimenez v. Quarterman,*
555 U.S. 113 (2009) ........................................................................................... 10

*Justice v. Uncharted Labs, Inc. d/b/a Udio.com,*
2026 WL 1430232 (S.D.N.Y. May 21, 2026) ........................................... 2, 15, 17

*Koala v. Khosla*,
  931 F.3d 887 (9th Cir. 2019) ............................................................................ 8, 20

*Lasica v. Am. Online, Inc.*,
  2:15-CV-04230-GW, 2015 WL 6669503 (July 14, 2015) ................................ 16

*Lasica v. America Online, Inc.*,
  2015 WL 12791495 (C.D. Cal. Sept. 3, 2015) ............................................ 15, 16

*MDY Industries v. Blizzard Entertainment Inc.*,
  629 F.3d 928, 947 (9th Cir. 2010), *as amended on denial of reh'g*
  (Feb. 17, 2011) ...........................................................................................*passim*

*Sony Music Entertainment v. Uncharted Labs Inc., d/b/a Udio.com*,
  2026 WL 1019199 (S.D.N.Y. Apr. 15, 2026) ................................. 2, 14, 15, 17

*TD Ameritrade, Inc. v. Matthews*,
  2018 WL 3451463 (D. Alaska July 16, 2018) .................................................. 25

*Ticketmaster L.L.C. v. RMG Techs., Inc.*,
  507 F. Supp. 2d 1096 (C.D. Cal. 2007) .......................................................... 23

*Tohono O'odham Nation v. United States Dep't of the Interior*,
  138 F.4th 1189 (9th Cir. 2025) ......................................................................... 9

*Yout, LLC v. Recording Indus. Ass'n of Am., Inc.*,
  633 F. Supp. 3d 650 (D. Conn. 2022) ........................................................*passim*

**Statutes**

17 U.S.C. § 1201 ....................................................................................*passim*

**Regulations**

37 C.F.R. 201.40 ...................................................................................... 4, 5, 6

**Other Authorities**

*Access*, Merriam-Webster.com, https://www.merriam-
  webster.com/dictionary/access (last visited June 8, 2026) ............................. 10

H.R. Rep. No. 105-551 ............................................................................... 5, 14

S. Rep. No. 105-190 ................................................................................. 1, 4, 14

**INTRODUCTION**

Plaintiffs, three prominent YouTube creators, allege that Snap circumvented YouTube's digital locks designed to prevent users from accessing the high-resolution video files outside of YouTube's streaming environment. YouTube allows human users to view works through a controlled stream, but does not permit any user to download copies of the underlying video files to view or otherwise use outside of YouTube's platforms. The Complaint alleges that Snap circumvented these protections to download unauthorized copies of the works of tens of thousands of creators, including Plaintiffs, without any authorization. Consolidated Complaint ¶¶ 9, 88, 92 ("Compl.") (Dkt. 36). Section 1201(a)(1) of the Digital Millennium Copyright Act was designed to prohibit exactly this type of activity, proscribing any "circumvent[tion]" of a "technological measure" that "effectively controls access" to a copyrighted work. Recognizing that "copyright owners [would] hesitate to make their works readily available on the Internet" absent such protection, S. Rep. No. 105-190, at 8, Congress enacted Section 1201 to back—"with legal sanctions"—"copyright owners' use of 'digital walls' to protect their copyrighted works from piracy." *Green v. United States Dep't of Just.*, 111 F.4th 81, 89 (D.C. Cir. 2024) (cleaned up). The complaint's allegations of Snap's systematic circumvention of YouTube's "digital walls" easily state a claim for relief.

In its motion to dismiss, Snap asks the Court to defy controlling Ninth Circuit authority, ignore numerous district court decisions that contradict its position, and resolve a host of contested factual issues in *Defendant's* favor on a motion to dismiss. Snap's lead argument is that YouTube's digital locks that control access to the high-resolution video files are "copy controls," protected by a different statutory provision (§ 1201(b)), and not "access controls" protected by Section 1201(a). Because YouTube users can view videos through a controlled stream, Snap's argument goes, they already have "access" to the videos and therefore any controls preventing access

1

to the underlying high-resolution digital file are outside the bounds of Section 1201(a).

But the Ninth Circuit squarely rejected this argument in *Disney Enterprises, Inc. v. VidAngel, Inc.*, 869 F.3d 848 (9th Cir. 2017). *VidAngel* involved the circumvention of technological protection measures ("TPMs") that provided exactly the type of "conditional" access that Snap claims is categorically excluded from Section 1201(a) protection—that is, one that allows users to view works through a controlled mechanism, but prevents the user from accessing and copying the underlying digital file. *Id.* at 864. The *VidAngel* decision addressed whether a purchaser of DVDs—who, like YouTube users, could watch material through authorized means (*i.e.,* widely available DVD players)—violated Section 1201(a)(1) by decrypting the DVD's technological measures that controlled access to the DVD's underlying digital files. *Id.* at 864. The Court answered yes, holding that "us[ing] . . . software to decrypt the TPMs to obtain a digital copy" of the underlying video file "is exactly like 'breaking into a locked room in order to obtain a copy of a [movie]," violating Section 1201(a). *Id.* (citation omitted). It made no difference in *VidAngel* that the DVD purchaser already had the ability to *view* the films at issue, and it should make no difference here—especially on a motion to dismiss.

In fact, ***every*** district court to consider the issue after *VidAngel* has rejected Snap's argument and refused to hold that YouTube's TPMs fall outside the scope of Section 1201(a) protections as a matter of law. *See Sony Music Entertainment v. Uncharted Labs Inc., d/b/a Udio.com*, 2026 WL 1019199, at *3 (S.D.N.Y. Apr. 15, 2026) ("the Complaint plausibly alleges that YouTube employs technological measures that regulate access to its content and that Defendant circumvented them . . . . Whether YouTube's measures ultimately constitute access controls within the meaning of § 1201 requires a greater factual record than the pleadings contain," citing *VidAngel*); *see also Justice v. Uncharted Labs, Inc. d/b/a Udio.com*, 2026 WL 1430232 (S.D.N.Y. May 21, 2026) (same); *Cordova v. Huneault*, 817 F. Supp. 3d

2

819 (N.D. Cal. 2026) (same); *Yout, LLC v. Recording Indus. Ass'n of Am., Inc.*, 633 F. Supp. 3d 650 (D. Conn. 2022) (dismissing plaintiff's motion for a declaratory judgment that it had not violated Section 1201(a), because plaintiff "ha[d] not plausibly pled that YouTube lacks a [TPM]" or that the TPM "is not effective"); *Edland v. Basin Elec. Power Coop.*, 2021 WL 3080225 (D.S.D. July 21, 2021) (denying motion to dismiss Section 1201(a) claim). Snap's motion asks for an extraordinary departure from settled law to resolve this case on the pleadings, without any factual record or discovery.

Against this mountain of authority, the best Snap musters is an unpublished decision that pre-dates and conflicts with *VidAngel*, a tentative order that does not even address Section 1201(a), and an out-of-circuit district court decision about grocery store coupons. *See* MTD (Dkt. 42) at 20-21. None of this provides a basis to ignore the Ninth Circuit's decision in *VidAngel*, nor does it provide a basis to resolve every factual inference about the operation of YouTube's TPMs in *Snap*'s favor on a motion to dismiss.

Snap also protests that Plaintiffs "seek to bypass traditional copyright infringement elements and avoid affirmative defenses such as fair use." MTD at 7. But this argument—that Plaintiffs should bring copyright claims instead of DMCA claims—has long been rejected. It is true that fair use is not a defense to a claim under Section 1201(a), but that was Congress's deliberate choice. As the Ninth Circuit recognized in *MDY Industries v. Blizzard Entertainment Inc.*, Section 1201(a) reflects "Congress's intent, in light of the current digital age, to grant copyright owners an independent right to enforce the prohibition against circumvention of effective technological access controls." 629 F.3d 928, 947 (9th Cir. 2010), *as amended on denial of reh'g* (Feb. 17, 2011), *opinion amended and superseded on denial of reh'g*, No. 09-15932, 2011 WL 538748 (9th Cir. Feb. 17, 2011). In place of a fair use defense, Congress provided for several statutory and regulatory exemptions to Section 1201(a). These exemptions cover circumvention activity in a variety of

3

contexts, including for motion pictures used in certain documentary or parody films, creation of works accessible to persons with disabilities, and for university and nonprofit research. 17 U.S.C. § 1201(d); 37 C.F.R. 201.40(b)(1)(i)–(ii); 37 C.F.R. 201.40(b)(2)(i).

Snap makes no argument that its conduct is protected by any of these exemptions, nor does Snap claim that it sought an exemption from the Librarian of Congress before engaging in large-scale circumvention of YouTube's TPMs. The Court should reject Snap's effort to achieve through judicial rewriting what it has failed to pursue through the proper regulatory channel.

At this stage, Plaintiffs need only plausibly allege (1) their works are protected by a "technological measure" that "effectively controls access" to the works, and (2) that Snap circumvented an effective technological measure to access Plaintiffs' works. Because they have done so, Snap's Motion to Dismiss should be denied.

## BACKGROUND

### I.  The Digital Millennium Copyright Act and Section 1201(a)

The DMCA was a response to the Internet's rapid growth. Congress enacted the DMCA to "create[] the legal platform for launching the global digital online marketplace for copyrighted works" and to "facilitate making available quickly and conveniently via the Internet the movies, music, software, and literary works that are the fruit of the American creative genius." S. Rep. No. 105-190, at 8. Congress recognized that "without reasonable assurance that [rightsholders] will be protected against massive piracy," rightsholders would "hesitate to make their works readily available on the Internet." *Id.*

Thus, Section 1201 was born. The DMCA "'backed with legal sanctions' copyright owners' use of 'digital walls' to protect their copyrighted works from piracy." *Green*, 111 F.4th at 89 (citation omitted). Those walls, called technological protection measures, or "TPMs," limit both the use of and access to copyrighted works. *Id.* Section 1201 prohibits (1) circumventing or trafficking in a technology

4

designed to circumvent a TPM that "controls access" to a copyrighted work, 17 U.S.C. § 1201(a); and (2) trafficking in a technology designed to circumvent a TPM that "protects a right of a copyright owner," *id.* § 1201(b). These provisions are not mutually exclusive—Congress did not pass any language rendering them so, and the Ninth Circuit has stated that they are not. *VidAngel*, 869 F.3d at 864.

## II. Exemptions to Section 1201(a)

Congress understood that Section 1201(a) has the potential to prohibit certain noninfringing fair uses of copyrighted material. H.R. Rep. No. 105-551 (II), at 35–36. For this reason, the anti-circumvention provision is subject to specific statutory and regulatory exemptions. *See* 17 U.S.C. § 1201(d). Congress also created a rulemaking process to accommodate the ever-changing nature of technology, through which additional categories of exemptions can be granted. Under Section 1201(a)(1)(C), the Librarian of Congress conducts a triennial rulemaking proceeding to grant exemptions to those who are likely to be "adversely affected" by the anti-circumvention provision in their ability to make noninfringing fair uses of copyrighted materials. *Green*, 111 F.4th at 90.

Two exemptions are of note here. The first is an exemption that allows educators and students to lawfully circumvent, for educational purposes, TPMs that control access to audiovisual files (codified at 37 CFR 201.40(b)(1)(ii)(A)). In 2020, a group of professors and other organizations petitioned the Copyright Office to recommend that the Librarian of Congress extend this exemption.[1] The Office, in explaining why it supported the petition, specifically referenced "the need of a communication professor to embed [YouTube video] clips in PowerPoint rather than played from YouTube 'because she wants to show higher quality clips and to avoid showing the attached advertisements to her students.'" *Id.* If YouTube's TPMs were not "access controls" under Section 1201(a)—as Snap contends—the professor

---

[1]    https://www.federalregister.gov/documents/2020/10/15/2020-22893/exemptions-to-permit-circumvention-of-access-controls-on-copyrighted-works

5

would have no need for an exemption to embed YouTube clips in educational PowerPoints, and there would be no need for the Office to cite this example in support of one.

The second exemption allows the circumvention of TPMs for the purpose of excerpting "short portions of . . . motion pictures . . . [f]or the purpose of criticism or comment . . . [f]or use in documentary filmmaking, or other films where the motion picture clip is used in parody or for its biographical or historically significant nature." 37 C.F.R. 201.40(b)(1)(i)(A). As Snap notes, the owners of Plaintiff Ted Entertainment, Ethan and Hila Klein, make "reaction videos" on YouTube, which intersperse short segments of other works with their criticism and commentary. Many reaction videos would likely fall under this exemption. Thus, contrary to Snap's suggestion, exemptions can and do exist that allow using YouTube videos for traditional fair use purposes. But no exemption exists that permits mass-circumvention to download millions of videos for commercial use. Snap has apparently not sought an exemption, nor received one.

## III. YouTube and Access Restrictions

YouTube, one of the world's largest online streaming platforms, is perhaps the most potent example of how the careful balance struck by Section 1201(a) has helped foster the "thriving electronic marketplace" that Congress intended. Rightsholders—ranging from major film studios to independent creators like Plaintiffs—can upload content to YouTube for streaming. Rightsholders are then able to rely on YouTube's ad-supported streaming service for revenue. Compl. ¶ 120.

Central to YouTube's appeal for rightsholders is the control they retain through the platform's content-sharing process. Rightsholders can upload content for public streaming via YouTube's authorized, ad-supported playback mechanism while simultaneously retaining control over the way their content is viewed and used. Compl. ¶ 8. While users can *stream* content through YouTube's environment, their access to that content is restricted in a number of important ways. For example,

6

YouTube users with a free account are required to view advertisements prior to streaming content, and YouTube's Terms of Service expressly prohibit users from "access[ing], reproduc[ing], download[ing], distribut[ing], transmit[ting], broadcast[ing], display[ing], sell[ing], licens[ing], alter[ing], modify[ing] or otherwise us[ing] any part of the Service or any Content except: (a) as expressly authorized by the Service; or (b) with prior written permission from YouTube and, if applicable, the respective rights holders." *Id.* ¶ 72 n.3.

The Complaint alleges that YouTube employs at least five TPMs intended to protect the video files underlying its streaming content. *Id.* ¶¶ 35-46. Each independently functions as a gatekeeping mechanism that must be satisfied before the audiovisual file can be retrieved. <u>TPM (1)</u>, the "rolling cipher," controls access to the underlying media file by withholding a usable file location unless the requesting client transforms an obfuscated signature parameter using proprietary logic embedded in the official YouTube player. Unless a requesting client performs this decryption, the server will not return the audiovisual file. *Id.* ¶¶ 50-52. This ensures that users only access content through YouTube's authorized playback mechanism. *Id.* ¶ 51. <u>TPM (2)</u>, "IP-based blocking and rate limiting," monitors network behavior and curtails access to YouTube's servers upon detecting excessive or abusive request patterns—requests from an IP address that exceeds defined thresholds may be throttled, denied, or blocked entirely, cutting off access altogether. *Id.* ¶¶ 53-55. <u>TPM (3)</u>, "session-bound short-lived URLs," restricts access by issuing URLs that are temporary, cryptographically signed, and tied to a particular playback session and client context. Once the authorization window expires or the session ends, the server will refuse to deliver the audiovisual file. *Id.* ¶¶ 56-57. Because these URLs expire automatically, automated systems attempting to gain access to videos outside of ordinary playback are unable to rely on a static link and instead must repeatedly obtain fresh authorization parameters and regenerate valid media URLs. *Id.* ¶ 57. <u>TPM (4)</u>, "CAPTCHA challenges," conditions continued access on

7

verification that the requester is human rather than an automated system. Until the challenge is successfully completed, the requesting client cannot obtain the data necessary to retrieve the audiovisual file. *Id.* ¶¶ 58-61. And TPM (5), "proof-of-origin tokens," requires that requests for video segments include cryptographic tokens demonstrating that the request originates from an authorized client environment; requests lacking valid tokens are denied or degraded. *Id.* ¶¶ 62-65. This prevents unauthorized software from directly requesting audiovisual files unless it possesses credentials proving it is an approved client. *Id.*

**IV. Snap's Circumvention of YouTube's Access Restrictions**

Snap deliberately circumvented YouTube's TPMs to gain unauthorized access to the underlying data files that are otherwise inaccessible to the public. *Id.* ¶¶ 96-112. On information and belief, Snap used several tools and methods to do so, such as descrambling tools like yt-dlp and IP rotation. *Id.* ¶¶ 99-103, 105, 110. Descrambling tools are used for "stream ripping," a process that involves automatically accessing audio and video files directly from a website's servers rather than viewing content through the provider's authorized playback environment. *Id.* ¶ 94. Descrambling tools like yt-dlp automate stream ripping by deciphering YouTube's rolling cipher and extracting the underlying media files from YouTube's servers. *Id.* ¶¶ 99-102. IP rotation involves the use of virtual machines to intentionally rotate IP addresses to bypass IP blocking and monitoring systems. *Id.* ¶¶ 103-04. By employing measures like these, Snap circumvented YouTube's TPMs and gained unauthorized access to Plaintiffs' and the putative Class's content. *Id.* ¶¶ 96-112.

**LEGAL STANDARD**

When considering a motion to dismiss under Rule 12(b)(6), a court must "accept the complaint's well-pleaded factual allegations as true, and construe all inferences in the plaintiff's favor[.]" *Koala v. Khosla*, 931 F.3d 887, 894 (9th Cir. 2019) (citation omitted). "To survive a motion to dismiss, a complaint must allege

8

'enough facts to state a claim to relief that is plausible on its face.'" *Tohono O'odham Nation v. United States Dep't of the Interior*, 138 F.4th 1189, 1199 (9th Cir. 2025) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

## ARGUMENT

The conduct at issue in this case falls under Section 1201(a) (the "anti-circumvention provision"). To state a claim under Section 1201(a), Plaintiffs need only plead that access to their work is protected by an effective technological measure, defined as a measure that "requires the application of information, or a process or a treatment, with the authority of the copyright owner, to gain access to the work," and that Snap circumvented the relevant technological measure, with circumvention defined as "descrambl[ing] a scrambled work, . . . decrypt[ing] an encrypted work, or otherwise . . . avoid[ing], bypass[ing], remov[ing], deactivat[ing], or impair[ing] a technological measure, without the authority of the copyright owner." 17 U.S.C. § 1201(a)(3)(A)-(B).

Plaintiffs allege unambiguously and with specificity that Snap deliberately circumvented YouTube's TPMs to gain unauthorized access to the data files underlying Plaintiffs' works. For the reasons that follow, Snap's motion should be denied.

## I.    Plaintiffs Need Only Allege that YouTube's TPMs Control Access, Not That They Prevent All Viewing

Snap's motion rests almost entirely on the incorrect premise that because Plaintiffs' works are viewable on YouTube, Plaintiffs have no Section 1201(a) claim because YouTube's TPMs are only "copy controls," not "access controls." That argument has no foundation in the statutory text or legislative history, and has been squarely rejected by numerous courts, including the Ninth Circuit.

Snap first argues that Section 1201(a) should be read only to prohibit the circumvention of measures that "*prevent* a person from *perceiving* the work." MTD

9

at 7 (emphases added). Thus, because Plaintiffs' works can be viewed on YouTube, Snap claims that Plaintiffs have no Section 1201(a) claim. Nothing supports this rewriting of Section 1201(a)'s plain text—in fact, the Ninth Circuit has squarely rejected it. Nor would Snap's motion be successful even under its own interpretation.

Start with the plain language of the statute. *See Jimenez v. Quarterman*, 555 U.S. 113, 118 (2009) (a court's interpretation of a statute should start with the "plain language of the statute"). The plain text of the statute says "access"; not "perceive," "view," or "watch." "Access" includes the "freedom or ability to obtain or make use of something." *See Access*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/access (last visited June 8, 2026). As courts have long found, anti-circumvention measures governed by Section 1201(a) do not just include measures that prohibit viewing or perceiving copyrighted work—such as "requir[ing] a log-on code to access videos," but also measures that control *obtaining* the underlying media files—such as those that "encrypt the media to prevent copying," *Advanced Med. Tech. Ass'n v. Library of Congress*, 2025 WL 2029804, at *2 (D.D.C. July 21, 2025), or "restrict access to downloadable files," *Cordova*, 817 F. Supp. 3d at 834; *see also Yout*, 633 F. Supp. 3d at 664 (citing Merriam Webster and concluding that TPMs "that restrain a YouTube user's freedom or ability to access the location where downloadable files are stored and download them" are plausibly access controls). That is exactly what Plaintiffs allege: that YouTube employed TPMs restricting users' "freedom or ability to obtain" (*i.e.* "access") the underlying audiovisual files, and Snap circumvented those controls to "obtain[] millions of videos from YouTube's platform." Compl. ¶¶ 37, 123.

Further, the plain text of the statute says "effectively *controls* access," not "effectively *prevents* access." "[T]he plain meaning of a measure that 'controls access' to a protected work appears to be broader than a measure that 'prevents' access to a copyrighted work." *Yout*, 633 F. Supp. 3d at 664. As the Ninth Circuit has explained,

> The statutory definition of the phrase "effectively control access to a work" does not require that an access control be strong or circumvention-proof. Rather, it requires an access control measure to provide some degree of control over access to a copyrighted work. As one district court has observed, if the word "effectively" were read to mean that the statute protects "only successful or efficacious technological means of controlling access," it would "gut" DMCA § 1201(a)(2), because it would "limit the application of the statute to access control measures that thwart circumvention, but withhold protection for those measures that can be circumvented."

*MDY Indus., LLC*, 629 F. 3d at 954 n.17 (9th Cir. 2010) (citation omitted).

The Ninth Circuit's decision in *Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848 (9th Cir. 2017), is directly on point and squarely forecloses Snap's arguments. In *VidAngel*, the plaintiffs made their movies available on DVDs. *Id.* at 853 Anyone with those DVDs could watch the movies as much as they wanted, but their access was conditional—they had to watch the movies using an authorized DVD player. *Id.* at 864. The DVDs had TPMs to control anyone from accessing, and copying, the underlying digital contents. But the defendant circumvented those TPMs, "'ripping' the movies from [the] discs" and making a "filtered version" of the movie available for purchase on its own online streaming platform. *Id.* at 852, 860. The Ninth Circuit held that VidAngel's circumvention of the DVD's TPMs "to obtain a digital copy of the disc's movie" was "exactly like 'breaking into a locked room in order to obtain a copy of a [movie],'" and violated Section 1201(a). *Id.* at 865.

The facts alleged here are materially similar. YouTube users can watch videos on the platform, but YouTube's TPMs limit their access: They can watch the videos on YouTube's streaming platform. YouTube's TPMs are, as alleged in the Complaint, designed to prevent access to, and copying of, the full high-resolution digital file. But Snap circumvented those TPMs to obtain digital copies of millions of audiovisual files for its own benefit. That is a violation of Section 1201(a) under *VidAngel*.

11

Snap's attempts to distinguish *VidAngel* are unpersuasive. Snap claims that the encryption measures in *VidAngel* were "access controls," because "without an authorized DVD or Blu-Ray player (which contains the required decryption key), purchasers of the DVDs or Blu-Rays cannot view the movies that they purchased." MTD at 22 (emphasis added). But this misses the point. *VidAngel* rejects the central premise of Snap's argument, that once a user can *view* a work, there is no further protection under Section 1201(a).

Consider a comparison of the DVD purchaser in *VidAngel* and the YouTube user in this case. The DVD purchaser is authorized to watch the copyrighted movie as many times as she wants, provided she uses the authorized mechanism (*i.e.*, a licensed DVD or Blu-Ray player); the same purchaser circumventing the DVD's TPMs to watch the movie on an unauthorized player would violate Section 1201(a).[2] *VidAngel*, 869 F.3d at 864 ("unlawful circumvention" includes "decrypt[ing] the TPMs . . . on an unlicensed DVD player"). Likewise, YouTube users are authorized to watch YouTube videos repeatedly, provided they use the authorized streaming mechanism (*i.e.*, through YouTube's platforms). Compl. ¶¶ 3, 29, 32 (alleging that TPMs restrict users to viewing "content" only through "YouTube's authorized playback mechanism"). The TPMs in *VidAngel* were designed to prevent the DVD purchaser from both viewing the DVD through an unlicensed mechanism *and* from accessing and reproducing the underlying video file saved on the DVD. Here, the TPMs are designed to prevent YouTube users from viewing the videos outside of

---

[2] In this sense, the TPMs at issue in *VidAngel* did not "restrict access to authorized users," MTD at 21, as Snap argues, but instead gave *every* DVD purchaser the ability to view the movie so long as they used the authorized mechanism, i.e., a licensed player. Likewise, YouTube users may enjoy videos through the authorized method—through ad-supported or subscription streaming on YouTube's protected environment—but cannot bypass YouTube's TPMs to access the copyrighted works in other ways.

12

YouTube's streaming platform *and* from accessing and reproducing the underlying video file.

Snap's argument also wrongly suggests that there is only one type of access control—an access control that prevents any viewing (*e.g.* by the video behind a paywall). But as *VidAngel* holds, a TPM that controls the *manner* of access is entitled to the full protection of Section 1201(a). VidAngel made the same argument that Snap makes here—that an encryption measure designed to prevent *copying* the video file saved on the DVD was a "use control" governed by Section 1201(b), not an "access control" governed by Section 1201(a). *Id.* at 864. The Ninth Circuit disagreed. *Id.* at 864-65. It found that the plaintiffs' TPMs—which were designed to prevent the user from copying the underlying digital file—were access controls governed by Section 1201(a). *Id.*

Indeed, Snap's narrow interpretation of Section 1201(a) would upend the entire content streaming industry, contrary to what Congress intended. In enacting Section 1201(a), Congress "was particularly concerned with encouraging copyright owners to make their works available in digital formats such as 'on-demand' or 'pay-per-view,' which allow consumers effectively to 'borrow' a copy of the work for a limited time or a limited number of uses." *MDY Indus., LLC*, 629 F.3d at 947. As the House Commerce Committee warned, "[t]o operate in this environment, content providers will need both the technology to make new uses possible and the legal framework to ensure they can protect their work from piracy." *Id.* (quoting H.R. Rep. No. 105-551 pt. 2, at 23 (1998)). Congress clearly had in mind that Section 1201(a) would not just encompass access controls that prohibit users from viewing the works (such as a paywall), but also those that protect streamers from piracy (by requiring users to view works through a controlled stream and prevent, for example, Netflix users from downloading movies). If Section 1201(a) did not extend to this latter type of "access control," then copyright owners would never make their works available for on-demand streaming.

13

The fact that Plaintiffs' works are "publicly available" or "free," as Snap claims, as opposed to "pay-per-view" does not move the needle. *See* MTD at 7-8. For starters, Plaintiffs offer their works for streaming on YouTube in two ways—either through YouTube's ad-supported "freemium" model or through YouTube's Premium subscription service. Compl. ¶ 121. Nothing in Section 1201(a) provides less protection for ad supported business models than other ways of disseminating copyrighted material over the internet. In fact, the opposite is true: With Section 1201(a) protections, Congress sought to encourage rightsholders and creators to disseminate their works broadly on the internet and foster new, innovative business models. S. Rep. No. 105-190, at 8 ("The [DMCA] . . . provides . . . protection and creates the legal platform for launching the global digital online marketplace for copyrighted works. It will also make available via the Internet the movies, music, software, and literary works that are the fruit of American creative genius."); H.R. Rep. No. 105-551(I), at 9 (the DMCA is "intended to ensure a thriving electronic marketplace for copyrighted works on the Internet").

This is precisely why courts have found that "free" and "public" copyrighted work can still be protected by an "access control" governed by Section 1201(a). *See Cordova*, 817 F. Supp. 3d at 834 (concluding that it is "immaterial" that YouTube videos "may be viewed by the public."); *Yout*, 633 F. Supp. 3d at 675. The Ninth Circuit's decisions in *VidAngel* and *MDY* make clear that access controls do not just include those that *prevent* viewing (like a paywall), but also those that *control* viewing (like a TPM that encrypts the underlying video file to prevent piracy). *MDY Indus., LLC*, 629 F.3d at 954 n.17; *VidAngel*, 869 F.3d at 864-65.

Unsurprisingly, and for many of the reasons addressed, district courts after *VidAngel* have uniformly denied motions to dismiss Section 1201(a) claims alleging circumvention of YouTube's TPMs. *See Cordova*, 817 F. Supp. 3d at 834 (examining YouTube's TPMs and denying the motion to dismiss); *Uncharted Labs*, 2026 WL 1019199, at *3 (finding that plaintiffs had plausibly alleged that YouTube's rolling

14

cipher was a TPM, and that Defendant circumvented the TPM); *Edland*, 2021 WL 3080225, at *6 (plaintiff "plausibly stated a claim for violation of [Section 1201(a)] of the DMCA" by alleging that the defendant "bypassed [YouTube's] TPMs when it successfully, copied, reproduced, and distributed the [YouTube] Videos, all without [plaintiff's] authorization"); *Justice*, 2026 WL 1430232, at *3 (applying *Uncharted Labs* to reach same outcome). *Cf. Yout*, 633 F. Supp. 3d at 671 ("[T]he [complaint] suggests that YouTube's technological measure is effective by alleging that YouTube has technology that functions to control access to downloadable files."). In *Uncharted Labs*, for example, Judge Hellerstein addressed materially similar allegations about YouTube TPMs brought by major music labels and the same arguments in the defendant's motion to dismiss. In denying the defendant's motion to dismiss, he found that the complaint "plausibly alleges that YouTube employs technological measures that regulate access to its content and that Defendant circumvented . . . . Whether YouTube's measures ultimately constitute access controls within the meaning of § 1201 requires a greater factual record than the pleadings contain." *Uncharted Labs*, 2026 WL 1019199, at *3. As in *Uncharted Labs*, the Complaint's allegations are above and beyond the threshold under Rule 8 and the question of whether YouTube's TPMs "effectively control access" to Plaintiffs' works cannot be resolved on the pleadings.

## II.  Snap's Cited Authorities Pre-Date And Conflict With *VidAngel*.

Snap does not even address or cite the mountain of authority repudiating the arguments in its Motion. Instead, Snap relies on three unpublished district court decisions that pre-date the Ninth Circuit's controlling decision in *VidAngel*. The first, *Hattler v. Ashton*, 2017 WL 11634742 (C.D. Cal. Apr. 20, 2017) recognized a sweeping rule that Section 1201(a) should be "interpreted narrowly to exclude technologies that permit access to copyrighted work, but restrict copying." *Id.* at *8. But *Hattler* predates *VidAngel* (as does *Lasica* and *Couponcabin*, addressed below) and its holding reflects an extremely narrow view of Section 1201(a) that cannot be

squared with *VidAngel*. Thus, to the extent *Hattler* is premised on the view that works that can be publicly viewed but not copied or downloaded cannot be the subject of a Section 1201(a) circumvention claim, it does not survive *VidAngel*.

Second, *Lasica v. America Online, Inc.*, 2015 WL 12791495 (C.D. Cal. Sept. 3, 2015) (*see* MTD at 21), is a tentative order involving a Section 1201(b) claim, *not* a Section 1201(a) claim. *Id.* at *5. Regardless, *Lasica* is distinguishable. There, the defendant had copied a photo from a photo-sharing website. *Id.* at *1. The plaintiff had not alleged that the website employed any TPM to control access to the photograph; the plaintiff had only alleged that the photograph was subject to licensing agreement which "explicitly prohibited the use of the [photograph] for commercial purposes." Amended Compl. and Demand for Jury Trial, *Lasica v. Am. Online, Inc.*, 2:15-CV-04230-GW, 2015 WL 6669503, at ¶¶ 8, 44 (July 14, 2015). Here, by contrast, Plaintiffs allege that Snap was not just prohibited from accessing creators' videos by YouTube's Terms of Service, but also that YouTube employed TPMs designed to enforce its Terms of Service.[3]

Snap's reliance on the out-of-circuit decision in *Couponcabin LLC v. Savings.com, Inc.*, 2016 WL 3181826, at *1 (N.D. Ind. June 8, 2016), is similarly

---

[3] Snap also cites *Lasica* for the premise that "[a] person who engages in prohibited usage of a copyrighted work to which he has lawful access does not run afoul of any provision of Section 1201." 2015 WL 12791495, at *5. But *Lasica* relies on *Ass'n for Info. Media & Equip. v. Regents of the Univ. of California*, 2012 WL 7683452, at *9 (C.D. Cal. Nov. 20, 2012) for that premise, which predates and conflicts with *VidAngel*. There, the court held that the defendant did not violate Section 1201(a) by copying plaintiffs' licensed DVDs because "UCLA had lawful access to the DVDs and Plaintiffs essentially allege improper usage of the DVDs." But *VidAngel* squarely rejects the argument that because a DVD-purchaser has "lawful access" to the DVD, it is "authorized . . . to decrypt [the TPMs] to view the discs' content." 869 F.3d at 863. Rather, "lawful purchasers have permission only to view their purchased discs with a DVD or Blu-ray player licensed to decrypt the TPMs." *Id.* at 863. The same is true here: The public has lawful access to view Plaintiffs' works on YouTube, but does not have permission to circumvent YouTube's TPMs to access the underlying video files.

16

unavailing. MTD at 21. The plaintiff in that case was a "leading provider of online, printable and grocery coupons." *Id.* at *1. After the plaintiff discovered "a marked increase in the amount of its unique content appearing on a number of competing websites," the plaintiff hired a security provider to block traffic "emanating from certain . . . service providers identified as being used particularly heavily by the Defendants to conduct scraping activities." *Id.* To get around this TPM, the defendants simply used other servers that hadn't been blocked. *Id.* at *6. The court dismissed the plaintiff's § 1201(a) claim because the TPM was plainly ineffective: It blocked access to Plaintiff's website by certain users  but left the door wide open for other servers and internet service providers. *Id.* at *1, 6. Here, by contrast, Plaintiffs allege that YouTube's TPMs are intended to control access to audiovisual files by any individual or entity—it shuts the door to all.

**III. Plaintiffs Have Plausibly Alleged that YouTube's TPMs "Control Access" to Plaintiffs' Works, and That Snap Circumvented These TPMs**

Snap attacks each of the five TPMs alleged based on its misreading of the complaint and the governing law, and by making factual assertions about how the TPMs function that are beyond the pleadings in the complaint and which should be explored in discovery and addressed on summary judgment or trial, not resolved as a matter of law. *See Uncharted Labs*, 2026 WL 1019199, at *3 ("Whether YouTube's measures ultimately constitute access controls within the meaning of § 1201 requires a greater factual record than the pleadings contain," and cannot be resolved at the motion to dismiss stage); *Justice*, 2026 WL 1430232, at *3 (same).

Before addressing each of the TPMs individually, Snap argues at the outset that none of the TPMs are "access controls," but are instead "copy controls" that, as alleged, impede the "downloading of audiovisual content." MTD at 23-24. But the alleged TPMs inhibit a user's ability to both watch and download a video outside of YouTube's controlled environment, Compl. ¶¶ 34-38, 69, and the Ninth Circuit has

made clear, TPMs can function as *both* access controls *and* copy controls. *VidAngel*, 869 F.3d at 864; *MDY Industries*, 629 F.3d at 946.

Further, the TPMs are access controls because they restrict access to the underlying high-resolution audiovisual files, which are maintained behind the digital locks alleged in the Complaint. Thus, even if Snap never downloaded the videos, Snap's circumvention of the TPMs would still violate Section 1201(a). Section 1201(a)(1)(A) prohibits the *act* of circumventing a technological measure that effectively controls access to a copyrighted work. The statute makes no reference to the circumventor's *purpose* for circumventing an access control, nor does it condition liability on the nature of the post-circumvention conduct. *VidAngel* makes this clear. VidAngel circumvented TPMs in order to copy the underlying video files, but the Ninth Circuit still held that VidAngel had circumvented an access control. 869 F.3d at 864-65 (noting VidAngel's decision to "decrypt the TPMs to obtain a digital copy of the disc's movie"). So too here: The fact that Snap circumvented YouTube's TPMs to copy Plaintiffs' works does not negate the unauthorized circumvention of the access control.

As set forth below, Plaintiffs have adequately alleged that each of the five identified TPMs constitutes a technological measure that effectively controls access to copyrighted works, and that Snap circumvented those measures in violation of Section 1201(a).

A.    *TPM (1)—Rolling Cipher*

TPM (1), the rolling cipher, works by "withholding a usable file location unless the requesting client can transform an obfuscated signature parameter using proprietary logic embedded in the official YouTube player." Compl. ¶ 50. Unless a requesting client performs this decryption, the server will not return the audiovisual file. *Id.* This ensures that users only access content through YouTube's platform.

Snap asserts that YouTube's rolling cipher is not an "access control because it does not do anything to prevent anyone from watching a YouTube video"—the video

18

is viewable on YouTube's platform. MTD at 23. That argument fails for reasons already explained: The rolling cipher controls how users access the video—requiring users to view the video on YouTube's streaming platform and restricting them from obtaining the underlying audiovisual file, thereby acting as a "digital lock" that controls full access to a work. *See VidAngel*, 869 F.3d. at 865; *Cordova*, 817 F. Supp. 3d at 834 (plaintiff adequately alleged that YouTube's "rolling-cipher technology" was a TPM for purposes of Section 1201(a)).

Snap also argues that the rolling cipher is a "lock" that "always has its key attached," because a "sophisticated user[] of an ordinary web browser can obtain the URL for the underlying file regardless of the rolling cipher" by "read[ing] the publicly available computer code in the web page itself." MTD at 24. This argument—a factual argument about how the rolling cipher works—is nowhere alleged in Plaintiffs' complaint and would require the Court to look beyond the pleadings to accept. That is improper. *Huckstein v. Blixseth*, 2011 WL 164825, at *3 (C.D. Cal. Jan. 19, 2011) ("In general, a court does not look beyond the pleadings when considering a motion to dismiss. . . . [A] court may not take judicial notice of a fact that is 'subject to reasonable dispute.'") (citation omitted)). Whether the rolling cipher actually works by "read[ing] the publicly available computer code in the web page itself," and whether the TPM is "ineffective" as a result, are factual questions that cannot be resolved on a motion to dismiss.[4]

Even if the Court considered Snap's factual assertions outside the complaint, Snap is wrong. Snap seemingly argues that because the rolling cipher *can* be overcome by "*sophisticated users*," it necessarily does not function as a TPM. But Section 1201(a) "does not require that an access control measure be strong or

---

[4] Plaintiffs dispute that the "computer code" is "publicly available" in any meaningful sense. YouTube's player software executes the code automatically as part of YouTube's authorized streaming process, not to furnish users with the means of downloading files.

circumvention-proof. Rather, it requires an access control measure to provide *some degree of control* over access to a copyrighted work." 629 F.3d at 954 (emphasis added). As Snap concedes, the rolling cipher *does* provide a degree of control: it can only be circumvented by "sophisticated" users. Indeed, the Complaint alleges that Snap needed to use third-party "descrambling tools" to bypass the rolling cipher. Compl. ¶ 99. Clearly, the rolling cipher is not a "lock" that "always has its key attached" if Snap had to use a locksmith to pick it. At best, Snap has identified a factual dispute over whether the rolling cipher "effectively controls access," which is not something that can be resolved on a motion to dismiss. *See Koala*, 931 F.3d at 894 (a court must "construe all inferences in the plaintiff's favor").

B.    *TPM (2)—IP blocking*

Plaintiffs allege that YouTube monitors network behavior and blocks IP addresses that exhibit patterns consistent with abusive behavior, so that the IP addresses lose access to the entire YouTube platform. Compl. ¶ 103. Thus, Snap's claim that YouTube lacks any "authentication" barrier, MTD at 20, is wrong. The very first thing YouTube does is authenticate the requestor's IP address to determine whether the requestor can proceed to the site or if the IP address should be blocked. Plaintiffs allege that Snap circumvented TPM (2) by using "[a]n IP rotation scheme . . . specifically designed to defeat [YouTube's IP blocker] by cycling through different IP addresses to avoid detection and blocking before platform access can be terminated." Compl. ¶ 104. Plaintiffs allege that, absent circumventing YouTube's IP blocker, Snap could not have "download[ed] the volume of files . . . required to train Snap AI Video" because "[a] single physical machine with a fixed IP address would have been detected and blocked almost immediately given the volume of requests involved." *Id.* ¶ 105.

Snap argues that this TPM is not an "access control" because it does not "prevent the general public from accessing and viewing these works in the first instance." MTD at 25. That argument not only fails for reasons already explained,

but also fails because Plaintiffs have alleged that IP blocking can prevent the public from viewing works even in the first instance on YouTube's platform. As Plaintiffs allege, "[w]hen YouTube detects abnormal request volume originating from a particular IP address, it does not merely limit downloading. *It blocks that IP address from accessing the YouTube platform entirely*." Compl. ¶ 53 (emphasis added). As Plaintiffs explain, "[t]his mechanism therefore functions as a platform-wide access control." *Id.*

Next, Snap wrongly claims that Plaintiffs do not plead that TPM (2) is an "access control" because IP blocking does not "require the application of information, or a process or treatment … to gain access to the work" and instead "functions as a 'monitoring and blocking system.'" MTD at 25-26 (quoting 17 U.S.C. § 1201(a)(3)(B)). That argument also fails: Plaintiffs allege that when IP blocking is triggered, "YouTube's servers cut off platform access from the offending IP address entirely, preventing any further retrieval of audiovisual content from that source." Compl. ¶ 54. This is a "process or a treatment" controlling "access to the work." 17 U.S.C. § 1201(a)(3)(B). Indeed, Snap's argument that a "monitoring and blocking system" cannot be an access control has been squarely rejected by the Ninth Circuit. *See MDY*, 629 F.3d at 943 ("an access control measure can both (1) attempt to block initial access and (2) revoke access if a secondary check determines that access was unauthorized").

*Couponcabin* does not hold otherwise. *Contra* MTD at 26. There, the district court did not hold—as Snap claims—that IP monitoring blocks cannot be access controls. Instead, the court found that the plaintiff's specific IP monitoring blocks were ineffective control measures because they only blocked specific servers and internet service providers, while leaving others completely unblocked. *Id.* at *6. By contrast Plaintiffs allege that YouTube's IP blocker applies to everyone: YouTube's infrastructure monitors the number and frequency of requests originating from *any*

21

IP address. Compl. ¶ 54. Plaintiffs have adequately alleged that the IP blocker is a TPM that effectively controls access, and that Snap necessarily circumvented it.

C.     *TPM (3)—Session-bound, short-lived URLs*

Session-bound, short-lived URLs are temporary, encrypted URLs that automatically expire after a brief session. Once the authorization window expires or the session ends, YouTube's server will refuse to deliver the audiovisual file in response to that URL. Compl. ¶ 56.

Snap argues that Plaintiffs have not alleged circumvention of any session-bound, short-lived URLs because Snap could have "access[ed] or view[ed] the work without restriction *before* [the URL's] expiration." MTD at 26. That is a fact-based question that cannot be resolved as a matter of law. Plaintiffs allege that Snap engaged in "[b]ulk extraction of YouTube videos," the scale of which "cannot occur without circumventing YouTube's layered TPMs," and that "Snap . . . necessarily circumvented TPM No. 3 . . . [b]y programmatically renewing access credentials outside ordinary playback sessions," allowing Snap to "maintain[] uninterrupted access to files that would otherwise become unavailable once the original authorization lapsed." *Id.* ¶¶ 93, 109. These allegations are more than sufficient to plausibly allege that Snap circumvented TPM (3) to access at least some, if not all, of Plaintiffs' videos.

D.     *TPM (4)—CAPTCHA challenges*

Plaintiffs allege that YouTube deploys CAPTCHA challenges (tests "often requiring identification of objects in grainy images") when automated or suspicious activity is detected. Compl. ¶ 58. These challenges "perform a gatekeeping function by prohibiting a certain type of user (a bot) from accessing the platform and the audiovisual works hosted on it." *Id.*

Snap argues that CAPTCHA challenges are not "access controls" because they "do not block the public's access to the Works in the ordinary course of YouTube's operation"; CAPTCHA challenges only appear once YouTube has identified traffic

patterns that are "suspicious." MTD at 27. This argument misstates the DMCA's plain text. Section 1201(a)(3)(B) states that "a technological measure 'effectively controls access to a work' if *the measure*, in the ordinary course of *its* operation, requires the application of information, or a process or a treatment, with the authority of the copyright owner, to gain access to the work." 17 U.S.C. § 1201(a)(3)(B) (emphases added). Plaintiffs do not need to allege that the measure blocks access to the work "in the ordinary course of *YouTube's* operation." Rather, Plaintiffs need only allege that CAPTCHA, in the ordinary course of *its* operation, requires the application of information to gain access to the work. That is what Plaintiffs have alleged: that when CAPTCHA challenges appear, users must complete the challenge in order to "access[] the platform and the audiovisual works hosted on it." Compl. ¶ 58. For this reason, courts have regularly concluded that CAPTCHA is an access measure. *See, e.g.*, *Ticketmaster L.L.C. v. RMG Techs., Inc.*, 507 F. Supp. 2d 1096, 1112 (C.D. Cal. 2007) ("[B]ecause CAPTCHA 'in the ordinary course of its operation, requires the application of information … to gain access to the work,' it is a technological measure that regulates access to a copyrighted work."); *Ticketmaster L.L.C.*, 306 F. Supp. 3d 1164, 1174 (C.D. Cal. 2018) (same); *Craigslist, Inc. v. Naturemarket, Inc.*, 694 F. Supp. 2d 1039, 1056 (N.D. Cal. 2010) (same).

Snap also argues that Plaintiffs have not alleged that "any CAPTCHA challenge was triggered or overcome with respect to any of Plaintiffs' works, specifically." MTD at 27. Snap does not cite anything for its contention that Plaintiffs must allege which of their works were accessed and obtained as a result of Snap's circumvention of CAPTCHA. Plaintiffs' allegations at the motion to dismiss stage are more than sufficient. Plaintiffs allege that Snap's "[l]arge-scale scraping operations" would "necessarily generate request patterns that trigger CAPTCHA challenges," and that Snap circumvented these challenges by using "rotating IP addresses." *Id.* ¶ 59. One can reasonably infer that, given Snap's alleged large-scale scraping operations, Snap circumvented YouTube's CAPTCHA challenges to gain

23

unauthorized access to at least some, if not all, of Plaintiffs' works. That reasonable inference is precisely the kind the Court must draw in Plaintiffs' favor at this stage. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

### E.     *TPM (5)—Proof-of-origin token*

Plaintiffs allege that YouTube generates tokens during playback to verify that requests originate from authorized clients operating within the intended playback context. Compl. ¶ 62. Plaintiffs allege that Snap circumvented this measure "[b]y rotating to a new IP address whenever session-level anomaly detection threatened to cut off the token supply . . . ensur[ing] uninterrupted access to the valid credentials required to obtain audiovisual file data from YouTube's servers." *Id.* ¶ 111. If Snap had not circumvented this measure, "YouTube's servers would refuse to deliver the requested audiovisual files." *Id.* ¶ 64.

Snap's sole argument is that because "anyone can watch Plaintiffs' YouTube videos" on YouTube's platform, the proof-of-origin token is not an "access control." MTD at 28. Again, Snap misses the point. This TPM controls access by prohibiting users from obtaining the underlying audiovisual file. As Snap concedes, the proof-of-origin token "may make downloading harder." *Id*. That does not defeat Plaintiffs' claim but supports it: By making downloading harder, the proof-of-origin token controls how users view Plaintiffs' works—on YouTube's platform. Plaintiffs have plausibly alleged that the proof-of-origin tokens are access controls.

## IV. Plaintiffs Have Sufficiently Alleged the Timing of YouTube's Technological Protections and Snap's Alleged Downloading

Snap argues that the Complaint should be dismissed for failure to identify the date YouTube "implemented" the TPMs at issue and that they were "in place" at the time that Snap circumvented them. MTD at 28-29. But the Complaint is more than sufficient on this score. Plaintiffs have alleged that YouTube had at least five TPMs, and that Snap, in fact, circumvented all of them "in order to feed, train, improve, and commercialize [Snap's] large-scale generative text-to-video [AI] models" at the time

that it scraped the videos. Compl. ¶¶ 1, 45-49, 94-112. That is more than sufficient to plausibly allege that the TPMs were in existence at the time of circumvention.

Snap's cited caselaw is irrelevant. In *TD Ameritrade, Inc. v. Matthews*, 2018 WL 3451463, at *6 (D. Alaska July 16, 2018), the plaintiff alleged that the defendant had "hacked" and "destroyed [his] hard drive controller," violating Section 1201(a). But the plaintiff "did not allege any facts regarding the security of his hard drive or facts to indicate that his hard drive had encryption technology that was circumvented by [the defendant]." *Id.* Here, by contrast—and as Snap acknowledges—plaintiffs have "described a variety of technological measures" that Snap circumvented.

Plaintiffs' claims are more than enough to put Snap on notice of the claims against it. That is all that is required at this stage.

## CONCLUSION

For the foregoing reasons, the Court should deny Snap's motion to dismiss. If it concludes that any of Plaintiffs' claims are insufficiently pleaded, Plaintiffs respectfully request leave to amend.

Dated: June 8, 2026

**SUSMAN GODFREY L.L.P.**

By: /s/ *Rohit D. Nath*
SUSMAN GODFREY LLP
Rohit D. Nath (SBN 316062)
Michael Gervais (SBN 330731)
SUSMAN GODFREY L.L.P
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067-2906
Telephone: (310) 789-3100
RNath@susmangodfrey.com
MGervais@susmangodfrey.com
SFrazier@susmangodfrey.com

Max L. Tribble, Jr. (SBN 326851)
Justin A. Nelson (*pro hac vice application forthcoming*)

25

SUSMAN GODFREY L.L.P
1000 Louisiana Street, Suite 5100
Houston, TX 77002-5096
Telephone: (713) 651-9366
MTribble@susmangodfrey.com
JNelson@susmangodfrey.com

Morgan McCollum (admitted *pro hac vice*)
SUSMAN GODFREY L.L.P.
One Manhattan West, 50th Fl.
New York, NY 10001
Telephone: (212) 471-8344
MMcCollum@susmangodfrey.com

William J. Edelman (CA Bar No. 285177)
MILBERG, PLLC
280 S. Beverly Drive, Penthouse
Beverly Hills, CA 90212
Tel: (771) 474-1121
wedelman@milberg.com

Michael A. Acciavatti (*pro hac vice* forthcoming)
MILBERG, PLLC
405 East 50th Street
New York, NY 10022
Tel: (212) 594-5300
macciavatti@milberg.com

Rom Bar-Nissim (SBN 293356)
Rom@HeahBarNissim.com
HEAH BAR-NISSIM LLP
1801 Century Park East, Suite 2400
Los Angeles, CA 90067
Telephone: (310) 432-2836

Jarrett Lee Ellzey (admitted *pro hac vice*)
Tom Kherkher (admitted *pro hac vice*)

26

Leigh S. Montgomery (admitted *pro hac vice*)
ELLZEY KHERKHER SANFORD MONTGOMERY LLP
4200 Montrose Street, Suite 200
Houston, TX 77006
JEllzey@EKSM.com
TKherkher@EKSM.com
LMontgomery@EKSM.com


*Attorneys for Plaintiffs and the Proposed Class*

27

# CERTIFICATE OF COMPLIANCE

I, Rohit D. Nath, certify that the Plaintiffs' Opposition to Snap's Motion to Dismiss complies with Local Rule 11.6 and Judge Birotte's Standing Order for Civil Cases ¶ 12©, does not exceed 25 pages, excluding the parts of the brief exempted, and complies with the typeface requirements because it has been prepared in a proportionally spaced typeface (14-point Times New Roman) using Microsoft Word.

By: /s/ *Rohit D. Nath*
Rohit D. Nath

Plaintiffs' Opposition to Snap's Motion to Dismiss
Case No.: 2:26-cv-00754-AB-MBK

**CERTIFICATE OF SERVICE**

The undersigned certifies that a true and correct copy of the foregoing document has been served on all counsel of record via the Court's ECF system on June 8, 2026.

*/s/ Rohit D. Nath*

Rohit D. Nath

29