DARALYN J. DURIE (CA SBN 169825)
DDurie@mofo.com
JOSEPH C. GRATZ (CA SBN 240676)
JGratz@mofo.com
MORRISON & FOERSTER LLP
425 Market Street,
San Francisco, California 94105-2482
Telephone: 415.268.7000
Facsimile: 415.268.7522

BENJAMIN J. FOX (CA SBN 193374)
BFox@mofo.com
MORRISON & FOERSTER LLP
707 Wilshire Boulevard, Suite 6000
Los Angeles, California 90017
Telephone: 213.892.5200
Facsimile: 213.892.5454

CAROLYN M. HOMER (CA SBN 286441)
CMHomer@mofo.com
KATHRYN C. THORNTON (*pro hac vice*)
KThornton@mofo.com
ADITYA V. KAMDAR (CA SBN 324567)
AKamdar@mofo.com
MORRISON & FOERSTER LLP
2100 L Street NW, Suite 900
Washington, D.C. 20037
Telephone: 202.887.1500
Facsimile: 202.887.0763

*Attorneys for Defendant*
SNAP INC.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| TED ENTERTAINMENT, INC., MATT FISHER, GOLFHOLICS, INC., AND NICOLE CHMURA each individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>SNAP INC.,<br><br>Defendant. | Case No. 26-cv-00754-AB (MBK)<br><br>Judge: Hon. André Birotte Jr.<br><br>**DEFENDANT SNAP INC.'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS PLAINTIFFS' CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>Date:    July 17, 2026<br>Time:    10:00 a.m.<br>Crtrm:    7B<br><br>Action Filed:    January 23, 2026<br>Trial Date:    None |

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................................ 1

II.   ARGUMENT ..................................................................................................... 1

    A.   Plaintiffs' Opposition Does Not Establish Any Technological Controls on the Ability to Gain Access to the Work. ........................... 2

        1.   The plain text of the statute requires a measure that controls the ability to "gain access to the work." ....................... 2

        2.   The key case law applies Snap's interpretation of the statute, not Plaintiffs'. ................................................................ 3

    B.   Plaintiffs' Cases Undermine, Rather Than Support, Plaintiffs' Access Control Arguments. ................................................................. 6

        1.   *VidAngel* does not help Plaintiffs. ................................................ 6

        2.   *Hattler* distinguished DVD-encryption from public streaming cases. .......................................................................... 7

        3.   Plaintiffs' other cases fare no better. ........................................... 8

    C.   Plaintiffs Do Not Plausibly Allege That Each TPM Is An Access Control ................................................................................................ 10

        1.   The rolling cipher does not prevent access to videos on YouTube. ...................................................................................... 10

        2.   URLs that eventually expire do not prevent access to videos on YouTube. ................................................................... 10

        3.   IP blocking, CAPTCHAs, and proof-of-origin tokens limit the rate of access, but do not control access. ................... 11

    D.   Plaintiffs' Timing Argument Is Conclusory. ..................................... 12

III.  CONCLUSION ................................................................................................ 13

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Cordova v. Huneault*,
   817 F. Supp. 3d 819 (N.D. Cal. 2026)...........................................................8, 9

*Craigslist, Inc. v. Naturemarket, Inc.*,
   694 F. Supp. 2d 1039 (N.D. Cal. 2010)...........................................................11

*Disney Enters., Inc. v. VidAngel, Inc.*,
   869 F.3d 848 (9th Cir. 2017) ...................................................................*passim*

*Edland v. Basin Elec. Power Coop.*,
   No. 21-cv-4008-KES, 2021 WL 3080225 (D.S.D. July 21, 2021) .....................9

*Ets-Hokin v. Skyy Spirits, Inc.*,
   225 F.3d 1068 (9th Cir. 2000) ..........................................................................3

*Hattler v. Ashton*,
   No. 16-cv-4099-JAK, 2017 WL 11634742 (C.D. Cal. Apr. 20, 2017) .......7, 8, 9

*Justice v. Uncharted Labs, Inc.*,
   No. 25-cv-5029-AKH. 2026 WL 1430232 (S.D.N.Y. May 21, 2026) ...............9

*Lexmark International, Inc. v. Static Control Components, Inc.*,
   387 F.3d 522 (6th Cir. 2004) ....................................................................*passim*

*MDY Industries, LLC v. Blizzard Entertainment, Inc.*,
   629 F.3d 928 (9th Cir. 2010) ....................................................................*passim*

*Sony Music Ent. v. Uncharted Labs Inc.*,
   No. 24-cv-4777-AKH, 2026 WL 1019199 (S.D.N.Y. Apr. 15, 2026) ...............9

*Ticketmaster LLC v. Prestige Ent., Inc.*,
   306 F. Supp. 3d 1164 (C.D. Cal. 2018)...........................................................12

*Ticketmaster LLC v. RMG Techs., Inc.*,
   507 F. Supp. 2d 1096 (C.D. Cal. 2007)...........................................................12

*Universal City Studios, Inc. v. Corley*,
   273 F.3d 429 (2d Cir. 2001) ........................................................................7, 8

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

**Cases**

*Yout, LLC v. Recording Indus. Ass'n of Am., Inc.*,
   633 F. Supp. 3d 650 (D. Conn. 2022) ...................................................................9

**Statutes**

17 U.S.C. § 1201(a) .......................................................................................*passim*
17 U.S.C. § 1201(b) .......................................................................................*passim*

**Other Authorities**

H.R. Rep. No. 105–551(I) (1998)..........................................................................3

*Exemptions To Permit Circumvention of Access Controls on
   Copyrighted Works*, 85 Fed. Reg. 65,293, 65,298 (proposed Oct.
   15, 2020) ..........................................................................................................12

U.S. Copyright Off., *Section 1201 Rulemaking: Ninth Triennial
   Proceeding to Determine Exemptions to the Prohibition of
   Circumvention* (Oct. 2024)............................................................................11

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. INTRODUCTION

Plaintiffs' Opposition (ECF 50) confirms that their claim is about the bulk "copying" of videos that Plaintiffs made available for public streaming over YouTube, rather than about "access." Plaintiffs may not circumvent the limits that Congress built into the Copyright Act by pursuing a disguised copyright infringement claim and labeling it a § 1201(a) claim. Section 1201(a) requires them to point to technological protection measures ("TPMs") that control the ability "to gain access to the work." Plaintiffs point only to measures that they say make it harder to download a copy, rather than to gain access to the videos in the first instance. If Plaintiffs were right, it would be hard to imagine any copy control that would not also be an access control, and Congress's intentional distinction between § 1201(a) and § 1201(b) would collapse.

The case on which Plaintiffs focus their arguments, *VidAngel*, held only that technological protections that *actually control initial access* to a copyrighted work can still be the subject of a § 1201(a) claim even if they would *also* qualify as copy controls under § 1201(b). But here, Plaintiffs do not plausibly allege that YouTube's technological protections against downloading files also control the ability to gain access to Plaintiffs' works of authorship. Instead, Plaintiffs' Opposition confirms that the technological protections are alleged to police only whether and how one can copy their works, not whether one can gain access to those works.

For these reasons and those stated in Snap's Motion to Dismiss (ECF 42), the Court should dismiss Plaintiffs' Consolidated Complaint (ECF 36) with prejudice.

### II. ARGUMENT

Plaintiffs' Opposition fails for four independent reasons: (1) Plaintiffs' focus on access to the underlying file for YouTube's audiovisual works is misplaced and disregards the access/copy distinction established by Congress and recognized by

1

the Ninth Circuit; (2) Plaintiffs overread the authorities, which do not support their arguments; (3) anyone can watch Plaintiffs' videos on YouTube and none of the alleged TPMs control the ability to gain access to Plaintiffs' works; and (4) Plaintiffs don't allege when the TPMs in question were in place or when Snap allegedly downloaded the videos, so their allegation that the TPMs were in place when Snap allegedly downloaded the videos is an unsupported conclusion.

### A.  Plaintiffs' Opposition Does Not Establish Any Technological Controls on the Ability to Gain Access to the Work.

In their Opposition, Plaintiffs say that it does not matter that anyone can watch their video on YouTube, because that is not "access," in their view, to the "work" in question.  These arguments, as discussed below, run contrary to the statutory text and to the Ninth Circuit cases interpreting that text.

### 1.  The plain text of the statute requires a measure that controls the ability to "gain access to the work."

Plaintiffs' Opposition begins by arguing for an exceptionally broad reading of the word "access": that one dictionary defines it in a way that would sweep in any kind of restriction on copying or use.  There are two principal problems with Plaintiffs' textual argument.

First, Plaintiffs isolate the word "access" out of the context of the full statutory definition: "a technological measure 'effectively controls access to a work' if the measure, in the ordinary course of its operation, requires the application of information, or a process or a treatment, with the authority of the copyright owner, to **gain access** to the work."  17 U.S.C. § 1201(a)(3)(B) (emphasis added).  Thus, to control access, a technological measure must impose some technological "require[ment]" in order "to **gain** access to a work."  If one already has access to a work (for example because one can already watch the video on YouTube), one does not "**gain** access to the work" by downloading it from YouTube.  One cannot be said to "gain" what one already has.  That is why

2

§ 1201(a) "does not apply to the subsequent actions of a person once he or she has obtained authorized access to a copy of a work protected under Title 17, even if such actions involve circumvention of additional forms of technological protection measures." H.R. Rep. No. 105–551(I), at 18 (1998).

Second, Plaintiffs take too narrow a view of the statutory phrase "the work." Section 1201(a) asks whether a technological measure controls access *to the copyrighted work*, not whether it controls *a particular way of accessing that work*. "[T]he term 'work' or 'works' is used throughout the Copyright Act to refer to the 'subject matter' that the act is designed to protect: 'original works of authorship.'" *Ets-Hokin v. Skyy Spirits, Inc.*, 225 F.3d 1068, 1079 (9th Cir. 2000). That is why Plaintiffs are wrong to say that the "works" at issue are "the underlying high-resolution audiovisual files," ECF 50 at 18, which Plaintiffs say are protected even though anyone can access the same content by watching the videos on YouTube. Watching the videos and downloading the underlying files are two different routes to access the same copyrighted work, and the text of the statute asks specifically whether the measure in question controls the ability "to gain access to **the work**."

### 2. The key case law applies Snap's interpretation of the statute, not Plaintiffs'.

This distinction between measures that control gaining access to a work in the first instance and measures that merely control one of several routes for accessing a work has been at the center of a number of key decisions interpreting § 1201. One instructive case whose analysis was later adopted by the Ninth Circuit was *Lexmark International, Inc. v. Static Control Components, Inc.*, 387 F.3d 522, 546–47 (6th Cir. 2004). There, the defendant was accused of circumventing an authentication sequence that enabled a toner cartridge to function in a printer only if it was authorized by the printer's manufacturer. *Id.* The plaintiff alleged that the authentication sequence effectively controlled access to the software that ran inside the printer because the software would only allow the printer to print if the

3

authentication sequence was completed successfully. *Id.* The literal code for the authentication software inside the printer could be accessed with or without the authentication sequence, but the printer could not function without the authentication sequence. *Id.*

The Sixth Circuit held that the authentication sequence was not a measure that effectively controlled access to the software. The court held that the "authentication sequence, it is true, may well block one form of 'access' . . . by preventing the printer from functioning." *Id.* at 547. But it did "not block another relevant form of 'access,'" that is, *access to the copyrighted software*, *id.*, and for that reason did not "effectively control[] access" under § 1201(a). *Id.* "Because the statute refers to 'control[ling] access to a work protected under this title,'" the court held, "it does not naturally apply when the 'work protected under this title' is otherwise accessible." *Id.*

This analysis was cited with approval and applied by the Ninth Circuit in *MDY Industries, LLC v. Blizzard Entertainment, Inc.*, 629 F.3d 928, 952 (9th Cir. 2010). The defendant in *MDY* was the creator of the "multiplayer online role-playing game, World of Warcraft ('WoW')." *Id.* at 934–36. The plaintiff "developed and sold Glider, a software program that automatically plays the early levels of WoW for players." *Id.* at 935. Plaintiff moved to dismiss the defendant's counterclaim that Glider circumvented "Warden, a technology that [the defendant] developed to prevent its players who use unauthorized third-party software, including bots, from connecting to WoW's servers." *Id.* at 936, 942–43.

The issue on appeal was whether Warden was an access control and, if so, as to what. *Id.* at 952–54. The Ninth Circuit separated the works at issue into (1) WoW's "literal elements;" (2) its "individual non-literal elements," and (3) its "dynamic non-literal elements," meaning "the 'real-time experience' of playing WoW." *Id.* at 942–43. As to the first two works, the Ninth Circuit held that Warden did *not* control access because "the game client's software code" was

4

"available on a player's hard drive once the game client software is installed," and the "individual nonliteral components may be accessed by a user without signing on to the server." *Id.* at 952. "Since a player need not encounter Warden to access WoW's individual non-literal elements," the court held, "Warden does not effectively control access to those elements." *Id.* Warden qualified as an access control *only* for the third work at issue because there was no way to access those elements without the application of a particular technological access-control process on the plaintiff's server. *Id.* at 954.

Thus, although Warden "block[ed] one form of access" to WoW's literal and individual non-literal elements—"the ability to access them while connected to a WoW server"—it "le[ft] open the ability to access these elements directly via the user's computer." *Id.* at 953. *MDY* therefore followed *Lexmark*'s principle that a TPM does not effectively control access where it restricts one form of access but leaves another route unobstructed. *Id.* at 952–53; *Lexmark*, 387 F.3d at 546–47. If a technological measure "does nothing to prevent access to the plain text of the work, but is designed to prevent that work from being copied," there is no cause of action under § 1201(a). *MDY,* 629 F.3d at 946–47. This does not, of course, mean that a TPM must be circumvention-proof; it means that if the TPM protects only one route for accessing a work, and access to the same copyrighted work may be achieved through another route (for example, accessing the work directly at its storage location, as in *MDY*), the TPM does not effectively control access to the work.

Here, the alleged YouTube TPMs do not control access because they do not control the public's *gaining access to the copyrighted works*. Plaintiffs' YouTube videos are available to watch, in full resolution, on each respective video's YouTube web page, just as WoW's literal code was accessible by reading it from the user's hard drive. ECF 36 ¶¶ 2, 34, 36, 38. That route is left wide open, and

that there are measures making it harder to access those same videos by some other route does not amount to an access control.

### B.    Plaintiffs' Cases Undermine, Rather Than Support, Plaintiffs' Access Control Arguments.

#### 1.    *VidAngel* does not help Plaintiffs.

The *VidAngel* case involved DVDs and Blu-ray discs that were encrypted "against unauthorized access to and copying of their works" by using "Content Scramble System ('CSS'), Advanced Access Content Systems ('AACS') with optional 'BD+.'" *Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 853–54 (9th Cir. 2017).  Consumers did not possess the keys to decrypt the videos by owning the disc.  *Id.* at 853, n.1; 864–65.  Instead, they had to purchase a licensed DVD or Blu-ray player, which provided the decryption key necessary to view the work.  *Id.* at 853–54.

One material difference between *VidAngel* and this case was that in *VidAngel* the defendant "concede[d] that the CSS, AACS, and BD+ are encryption access controls." *Id* at 863.  Those encryption measures prevented *both* playback of the video *and* copying of the video in the absence of the necessary encryption key.  There was no question that the defendant used the unauthorized software program they acquired from convicted overseas criminals to decrypt the discs.  *Id.* at 853–54 & n.2, 863–65.  Thus, *VidAngel* does little to tell us what does and doesn't qualify as an access control, because in that case the defendant had conceded that the measures in question controlled access to the work.

Plaintiffs also cite *VidAngel* for the proposition that a TPM *can* constitute both a § 1201(a) access control and a § 1201(b) copy control.  ECF 50 at 11–13.  That is uncontroversial, and is consistent with *MDY*, which held that "if a copyright owner puts in place an effective measure that both (1) controls access and (2) protects against copyright infringement," they can apply both § 1201(a) and § 1201(b) with respect to that measure, but if the measure "does nothing to prevent

access to the plain text of the work," they cannot apply § 1201(a). *MDY*, 629 F.3d at 946–47. But Plaintiffs take an unjustified leap: they argue that *simply because* a TPM serves as a § 1201(b) copy control, it always *also* serves as a § 1201(a) access control. *VidAngel* does not support that proposition. In *VidAngel*, only people with the right encryption key, which wasn't distributed with the video, could watch the video. *VidAngel*, 869 F.3d at 864. Here, by contrast, anyone can watch Plaintiffs' videos with an ordinary web browser.[1] Thus, unlike *VidAngel*, there is no access control here.

### 2. *Hattler* distinguished DVD-encryption from public streaming cases.

Plaintiffs' attempts to distinguish *Hattler v. Ashton*, No. 16-cv-4099-JAK (KSx), 2017 WL 11634742 (C.D. Cal. Apr. 20, 2017)—which dismissed at the pleading stage a claim virtually identical to Plaintiffs'—are unavailing. They say that the case "cannot be squared with *VidAngel*," ECF 50 at 15–16, since *VidAngel* regarded DVD encryption as a § 1201(a) access control. But Judge Kronstadt's careful opinion in *Hattler* addressed those very questions by reference to an earlier case regarding DVD encryption, *Universal City Studios, Inc. v. Corley*, 273 F.3d 429 (2d Cir. 2001). *See Hattler*, 2017 WL 11634742, at *5–7.

In *Hattler*, the plaintiff alleged that the defendant had used portions of his videos, which he had posted to the video-sharing site Vimeo, in live concert performances and online marketing. *Id*. at *1. In support of his § 1201(a) claim, Hattler alleged that the defendants "downloaded the Works in a manner that

---

[1] Plaintiffs also claim YouTube's technological protections are "designed to enforce its Terms of Service," which prohibit unauthorized downloading. ECF 50 at 6–7, 16. But YouTube's Terms of Service also grant everyone the right to access YouTube's content, including "to view (*i.e.*, stream) audiovisual works." ECF 36 ¶¶ 67–68. And the technical reality bears this out——when anyone at all directs their web browser to https://www.youtube.com/watch?v=CXUs5FOo-JE, Plaintiffs' video starts playing automatically, no matter what a contract says. That technical reality, rather than labels like "authorized playback environment," governs.

7

circumvented the technological protections on the websites where the Works were available for streaming." *Id.* at *5. The defendants responded that those protections "restricted downloading, but not general access." *Id.*

The court agreed with defendants, finding that the relevant statutory question was whether the measure controlled access to the copyrighted work, as opposed to permitting viewing while restricting copying. *Id.* at *5–6. Relying on *Lexmark*, the court explained that § 1201(b), not § 1201(a), addresses measures "that allow some forms of 'access' but restrict other uses of the copyrighted work," such as "streaming media, which permits users to view or watch a copyrighted work but prevents them from downloading a permanent copy of the work." *Id.* at *6 (quoting *Lexmark*, 387 F.3d at 545).

The court distinguished the DVD-encryption case, *Corley*, on the grounds that DVD encryption used "to prevent the unauthorized viewing and copying of motion pictures" differs from "the Works here," which "were accessible for viewing to the general public." *Id.* at *7. Although the decision predates *VidAngel*, the analysis of *Corley* in *Hattler* provides a close parallel: in *VidAngel*, as in *Corley*, the encryption involved prevented both viewing and copying, whereas the measure here, as in *Hattler*, does not control access because here, as in *Hattler*, anyone who goes to a particular web page (there on Vimeo, here on YouTube) can access the plaintiff's video.

### 3.    Plaintiffs' other cases fare no better.

*Cordova v. Huneault*, 817 F. Supp. 3d 819, 832–35 (N.D. Cal. 2026), is nonbinding and inconsistent with the Ninth Circuit's holding in *MDY*. *Cordova* treats any measure "intended to prevent unauthorized downloading" as sufficient to plead an access control, and that reasoning conflicts with *MDY*'s instruction that the measure must control *access* to the copyrighted work. *Cordova*, 817 F. Supp. 3d at 834; *MDY*, 629 F.3d at 952–54. On that logic, *MDY* would have turned out differently because there was a measure intended to prevent unauthorized game-

playing, but the court held there was no access control.  And on that logic, *Lexmark* would have turned out differently because there was a measure intended to prevent unauthorized printing, but the court held that there was no access control.  An access control must control *access*, not something else (like downloading).  Indeed, the facts of *Cordova* show why this distinction is so important: the defendants in *Cordova*, like the plaintiffs here, are in the business of making YouTube videos that incorporate and comment upon the YouTube videos of others, which they regard as fair use.  817 F. Supp. 3d at 829.

*Sony Music Entertainment v. Uncharted Labs Inc.*, No. 24-cv-4777-AKH, 2026 WL 1019199 (S.D.N.Y. Apr. 15, 2026) and *Justice v. Uncharted Labs, Inc.*, No. 25-cv-5029-AKH. 2026 WL 1430232 (S.D.N.Y. May 21, 2026), from a court outside this circuit, are not consistent with the *MDY* holding that to be an access control, a measure must control whether one can gain access to a work, not just control one route.  And they do not have the benefit of the *Hattler* decision in this district, which distinguishes the DVD cases cited by the *Uncharted Labs* plaintiffs because DVD encryption controls initial access, not just copying.

*Yout, LLC v. Recording Industry Association of America, Inc.*, 633 F. Supp. 3d 650 (D. Conn. 2022) is nonbinding authority currently on appeal, and is procedurally unusual.  Because that was a declaratory-judgment case, the question at the pleadings stage was whether the allegations fully *negated* any possible claim, rather than, as here, whether the allegations *establish* a claim.  It therefore sheds little light on whether the allegations here pass muster.

*Edland v. Basin Electric Power Cooperative*, No. 21-cv-4008-KES, 2021 WL 3080225 (D.S.D. July 21, 2021), is an out-of-circuit case that does not cite or apply any of the cases on the access/copy distinction, reaching the absurd result that recording a YouTube video from a screen with a cell phone camera gives rise to a claim under § 1201(a).  That kind of result—which would trammel fair uses like Plaintiffs' and like Snap's—is where Plaintiffs' logic leads.

9

**C.      Plaintiffs Do Not Plausibly Allege That Each TPM Is An Access Control.**

**1.      The rolling cipher does not prevent access to videos on YouTube.**

Plaintiffs claim that because the rolling cipher constrains downloading audiovisual files, it "controls how users access the video." ECF 50 at 19. Plaintiffs continue to conflate access to the copyrighted work with controlling one particular route to access a work while leaving other routes unimpeded. Plaintiffs do not allege that the rolling cipher prevents anyone from watching their videos on YouTube. ECF 36 ¶ 36. Plaintiffs attempt to manufacture a factual dispute about how the rolling cipher functions to avoid dismissal. ECF 50 at 18–19. But even if users visiting YouTube receive "a scrambled signature" which is "processed to produce a valid media request URL" through the "proprietary logic embedded in the official YouTube player," as Plaintiffs allege, users visiting YouTube still receive "a continuous audiovisual experience." ECF 36 ¶¶ 34, 44, 50. That is simply a fancy way of saying that anyone who goes to https://www.youtube.com/watch?v=CXUs5FOo-JE with any web browser can watch Plaintiffs' video (the 'work'), and that the web page includes everything needed for the web browser to play that video automatically. Under *MDY*, this measure is not an access control.

**2.      URLs that eventually expire do not prevent access to videos on YouTube.**

Plaintiffs contend that because Snap allegedly engaged in "[b]ulk extraction of YouTube videos," Snap "necessarily circumvented TPM No. 3 . . . [b]y programmatically renewing access credentials outside ordinary playback sessions." ECF 50 at 22. That describes a constraint on a particular kind of copying, not a condition that must be satisfied before a viewer can gain access to the work. The videos remain publicly viewable through YouTube's ordinary playback pages.

10

ECF 36 ¶¶ 44, 57.

### 3. IP blocking, CAPTCHAs, and proof-of-origin tokens limit the rate of access, but do not control access.

Plaintiffs allege that IP blocking and rate limiting respond to "abusive behavior" request patterns such as "abnormal request volume," and CAPTCHA is triggered by "automated or suspicious activity."  ECF 50 at 21, 22.

The Copyright Office has reviewed the same argument Plaintiffs make in their Opposition and determined that rate-limit enforcement systems do not effectively control access to a work because they do not require "the application of information, or a process or a treatment" to gain access; they instead require users to refrain from particular conduct.  *See* U.S. Copyright Off., *Section 1201 Rulemaking: Ninth Triennial Proceeding to Determine Exemptions to the Prohibition of Circumvention* (Oct. 2024) at 125 (finding these sorts of "rate limit enforcement systems do not effectively control access to a work as contemplated by section 1201").  The Register reviewed two rate limit evasion techniques claimed to circumvent access controls under § 1201(a): (1) backoff techniques and (2) IP address rotation.  *Id*.  The Register found that "[b]y employing backoff techniques, researchers are not avoiding or disabling the rate limit systems but attempting to stay within the limits by introducing delays."  The Register likewise concluded that "IP address rotation . . . does not appear to involve the circumvention of an effective control. . . . Since these measures did not prevent the defendants from accessing the plaintiff's web service via other servers and internet service providers, the technological measure did not effectively control access to a work."  *Id.*[2]

---

[2] Plaintiffs suggest in their brief that the grant of a different Copyright Office exemption implies that YouTube videos are protected by TPMs.  ECF 50 at 5–6.  Plaintiffs misunderstand their cited authority.  The exemption sought was to decrypt DVDs to embed clips of DVD movies in classroom PowerPoint presentations, because showing YouTube videos of those same movie clips was too low-quality

The CAPTCHA cases Plaintiffs rely on do not save their claim because in those cases, the defendant *always* had to solve a CAPTCHA to gain access.  *See Ticketmaster LLC v. RMG Techs., Inc.*, 507 F. Supp. 2d 1096, 1112 (C.D. Cal. 2007) (a CAPTCHA was presented every time "the user makes a ticket request on ticketmaster.com"); *Ticketmaster LLC v. Prestige Ent., Inc.*, 306 F. Supp. 3d 1164, 1174 (C.D. Cal. 2018) (same); *Craigslist, Inc. v. Naturemarket, Inc.*, 694 F. Supp. 2d 1039, 1048 (N.D. Cal. 2010) (a CAPTCHA was presented every time a user generates an account or ad).  In those cases, the court found that a CAPTCHA was an access control because nobody could access the material without solving a CAPTCHA.  Here, everybody can access the material without solving a CAPTCHA, and the complaint alleges that CAPTCHAs are presented to those who make many requests as a means of limiting the rate of those requests.  The facts alleged in the complaint thus describe a rate limit, not an access control.

Plaintiffs' allegations for proof-of-origin tokens reflect the same faulty logic as to access.  Plaintiffs allege that YouTube "generates tokens during playback to verify that requests originate from authorized clients operating within the intended playback context."  ECF 50 at 24.  If YouTube detects a "session level anomaly," then it "cut[s] off the token supply," stopping further delivery of "the requested audiovisual files."  *Id.*  That, too, describes the kind of rate-limiting measure that the Copyright Office has said is not an access control.

### D.  Plaintiffs' Timing Argument Is Conclusory.

Plaintiffs say that they are not required "to identify the date YouTube 'implemented' the TPMs at issue and that they were 'in place' at the time Snap circumvented them" because—according to Plaintiffs' Opposition—"Plaintiffs have alleged that YouTube had at least five TPMs, and that Snap, in fact, circumvented all of them . . . at the time that [Snap] scraped the videos" and "[t]hat

and included ads.  *Exemptions To Permit Circumvention of Access Controls on Copyrighted Works*, 85 Fed. Reg. 65,293, 65,298 (proposed Oct. 15, 2020), at https://www.federalregister.gov/d/2020-22893/p-64.

12

is more than sufficient to plausibly allege that the TPMs were in existence at the time of circumvention." ECF 50 at 24–25. But that is just assuming the conclusion Plaintiffs need to plausibly allege facts to support. If these TPMs are of such importance to Plaintiffs, surely they know when those TPMs were and were not in place. Simply alleging that the TPMs were in place *whenever they would have had to be in place for Plaintiffs to have a claim against Snap* is the sort of speculative pleading that cannot survive a motion to dismiss.

## III.   CONCLUSION

For the foregoing reasons, Plaintiffs' Consolidated Complaint should be dismissed in its entirety for failure to state a claim.

Dated: June 24, 2026

**MORRISON & FOERSTER** LLP

By: */s/ Joseph C. Gratz*
JOSEPH C. GRATZ
*Attorney for Defendant*
SNAP INC.

13

# <u>CERTIFICATE OF COMPLIANCE</u>

I, Joseph C. Gratz, certify that the Reply in the foregoing Motion to Dismiss Plaintiffs' Consolidated Class Action Complaint fully complies with Local Rule 11.6 and Judge Birotte's Standing Order for Civil Cases ¶ 12(c), does not exceed 15 pages, excluding the parts of the brief exempted, and complies with the typeface requirements because it has been prepared in a proportionally spaced typeface (14-point Times New Roman) using Microsoft Word (the same program used to calculate the word count).

*/s/ Joseph C. Gratz*
JOSEPH C. GRATZ

*Attorney for Defendant*
SNAP INC.

14

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the above and foregoing document has been served on all counsel of record via the Court's ECF system on June 24, 2026.

*/s/ Joseph C. Gratz*
JOSEPH C. GRATZ

15